**CITIBANK (S. DAKOTA), N.A., Appellant,**

v.

**Aphrom MICHEL, Appellee,**

No. 97 C 7722.

United States District Court, N.D. Illinois, Eastern Division.

May 7, 1998.

Allan S. Brilliant, Harold David Israel, Holleb & Coff, Bruce E. De'Medici, Attorney at Law, Chicago, IL, for Appellant.

Jeffrey F. Kohan, Attorney at Law, Chicago, IL, for Appellees.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge.

This case is before us on appeal from a final judgment of the bankruptcy court. Citibank brought an adversary proceeding against the debtor, Aphrom Michel, seeking to prevent him from discharging his debt to Citibank. Specifically, Citibank argued that Michel had borrowed money from it by fraudulent means, rendering the debt nondischargeable under 11 U.S.C. § 523(a)(2)(A). The bankruptcy court found that Michel had not committed fraud and therefore discharged the debt. For the reasons set forth below, we affirm.

### I. Background

Neither party challenges the facts found by Judge Barliant. Prior to 1996, Michel had a good credit record with Citibank, leading it to extend an $18,000 line of credit to him. In 1996, Michel fell into debt and tried a desperate ploy to save his family's finances: he traveled to Las Vegas, where he gambled $30,000 at the blackjack tables. Predictably, he lost it all, including $16,800 he had borrowed from Citibank. This result was predictable not just to an objective observer, but to Michel himself: despite the fact that he was a frequent gambler, Michel had *never* left a casino with a net profit.

Based on these facts, Judge Barliant concluded that Michel had acted in reckless disregard of a known risk: "At the time [Michel] obtained the advances from [Citi-

bank], [he] knew that he did not have the financial wherewithal to repay them unless he won at gambling.... He decided to risk so much because he believed the more he gambled the better his chances of winning, although he had never won at gambling." Tr. at 4–5.[1] Nevertheless, Judge Barliant concluded that Michel had not committed fraud:

> [T]he ultimate issue in this case is what it always is in these cases: Did the debtor know his representation was false when he made it and did he make it with the intent to deceive the creditors into extending the credit. The standard is subjective, not objective.... Applying that standard here, I find that the debtor did not know that his representations of an intent to repay the credits were false and did not make them with the actual intent to deceive.... He had deluded himself into believing that there was a realistic possibility that he would win. Given his credit, employment and family history, all of which were good, there is no reason to believe that he did not intend to use his winnings to pay his debts. Indeed, I believe the reason he changed his pattern of behavior by gambling more than he ever had was that he was trying to pay the large debts he had.

Tr. at 5–6, 8–9.

## II. Discussion

■ For a court to refuse to discharge a debt under § 523(a)(2)(A), it must find that: (1) the alleged fraud-feasor made a representation "either knowing it to be false or with reckless disregard for the truth"; (2) the misrepresentation was made with the intent to deceive; and (3) the creditor actually and justifiably relied on the misrepresentation. *In re Scarlata,* 979 F.2d 521, 525 (7th Cir.

1992); *In re Berz,* 173 B.R. 159, 162 (Bankr. N.D.Ill.1994); *see also In re Mayer v. Spanel Intern. Ltd.,* 51 F.3d 670, 675 (7th Cir.1995) ("[R]eckless disregard of the truth is a form of intent to defraud.").[2] A creditor seeking to prevent the discharge of a debt bears the burden of proving these elements by a preponderance of the evidence. *See Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

■ Citibank contends that by using his credit card Michel made two implicit representations: (1) that he had the ability to repay the money he borrowed, and (2) that he intended to do so. *See* Pl.'s Br. at 8–9, 12. We need not concern ourselves with any representation about ability to repay because fraud claims based on this kind of representation are not permitted under § 523(a)(2)(A). *See* 11 U.S.C. § 523(a)(2)(A) (expressly excluding from its coverage any "statement respecting the debtor's ... financial condition"); *In re Anastas,* 94 F.3d 1280, 1285 (9th Cir.1996).[3] With respect to the representation of *intent* to repay, neither party challenges Judge Barliant's finding that such a representation was made, *see* Tr. at 7, and most of the credit card cases we have found support his reasoning. *See In re Anastas,* 94 F.3d at 1285–86; *In re Christensen,* 193 B.R. 863, 866 (N.D.Ill.1996); *In re Bone,* No. 95 C 1720, 1995 WL 519728, at *2 (N.D.Ill. Aug. 22, 1995); *In re Feld,* 203 B.R. 360, 366 (Bankr.E.D.Pa.1996); *In re Berz,* 173 B.R. at 162; *but see In re Alvi,* 191 B.R. 724, 731–32 (Bankr.N.D.Ill.1996) (use of a credit card involves no implicit representations).

■ Thus, the critical factual question is whether Michel's professed intention to repay Citibank was false.[4] Citibank complains that Judge Barliant analyzed this question

---

1. References to Judge Barliant's oral ruling will be cited as "Tr. at ___." References to the trial transcript will be cited as "Trial Tr. at ___."

2. Although the Seventh Circuit's opinions in *In re Scarlata* and *In re Mayer* described the third element of a fraud claim as "reasonable" reliance, the Supreme Court subsequently indicated that § 523(a)(2)(A) requires only "justifiable" reliance. *See Field v. Mans,* 516 U.S. 59, 73–76, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995). The difference between these two types of reliance is

fully described in *Field,* but it is not important in this case.

3. To make a fraud claim based on a representation about the debtor's *ability* to pay, a creditor would have to proceed under § 523(a)(2)(B), but that section requires that the representation be in writing. There is no evidence that there was a written misrepresentation in this case.

4. In our view, when a person makes a representation about his or her own intent, that represen-

improperly, determining Michel's intent "solely by [his] stated subjective intent, however implausible, unreasonable or reckless." Pl.'s Br. at 1. This contention misconstrues the disposition below. A bankruptcy judge attempting to determine the applicability of § 523(a)(2)(A) must evaluate the subjective intent of the debtor: there is no fraud when a person makes a representation that he sincerely believes is true. *See Palmacci v. Umpierrez,* 121 F.3d 781, 788 (1st Cir.1997) ("A 'dumb but honest' defendant does not satisfy the test of scienter."); *In re Totina,* 198 B.R. 673, 680 (Bankr.E.D.La.1996); *In re Murphy,* 190 B.R. 327, 332 (Bankr.N.D.Ill. 1995); *see also* W. Page Keeton et al., PROSSER & KEETON ON TORTS, § 107, at 742 (5th ed.1984). A number of bankruptcy courts seem to disagree, finding debtors to have committed fraud merely because they lacked an objectively reasonable basis for believing that they could repay their debts, *see, e.g., In re Berz,* 173 B.R. at 163; *In re Clagg,* 150 B.R. 697, 698 (Bankr.C.D.Ill.1993), but this approach distorts the meaning of fraud. Under the common law—which governs the interpretation of § 523(a)(2)(A), *see Field,* 516 U.S. at 69 n. 9, 116 S.Ct. at 443 n. 9, fraud exists only if a speaker is *subjectively* aware that his statements are false or that they might be false. *In re Christensen,* 193 B.R. at 866; *In re Feld,* 203 B.R. at 365; *see also* RESTATEMENT (SECOND) OF TORTS § 530(1) ("A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention."). Obviously the court must consider objective evidence that is probative of the debtor's intent to repay in addition to considering the debtor's demeanor,[5] but the ultimate inquiry still seeks to determine the debtor's subjective intent. *See In re Anastas,* 94 F.3d at 1286 ("[T]he hopeless state of a debtor's financial condition should never become a substitute for an actual finding of bad faith."); *In re Sheridan,* 57 F.3d at 634 (objective circumstantial evidence may support a finding of fraud, but it does not compel such a finding when the trial judge finds the debtor's contrary testimony to be credible); RESTATEMENT (SECOND) OF TORTS § 526 cmt. d ("The fact that the misrepresentation is one that a man of ordinary care and intelligence in the maker's situation would have recognized as false is not enough to impose liability upon the maker for a fraudulent misrepresentation.").

▮▮▮ Judge Barliant's approach was legally sound: in addition to his own impressions of Michel's credibility, he considered all the objective evidence of intent that had been proffered, and he never barred Citibank from presenting potentially relevant objective evidence of Michel's intent at trial. Based on his review of the evidence, Judge Barliant found as a factual matter that Michel's representation of an intent to repay Citibank was not false, *see* Tr. at 9–10, and we may disturb this finding only if it is clearly erroneous. *See In re Sheridan,* 57 F.3d 627, 633 (7th Cir.1995). We believe that this finding is supported by the record. In the summer of 1996 Michel had a good credit record and held a steady job with a salary that had previously been sufficient to enable him to pay off his gambling debts. *See* Tr. at 2–3;

---

tation is either true or intentionally false. Unlike other kinds of factual misrepresentations, which can be fraudulent if made recklessly, *see supra,* we believe that it is impossible to make a reckless statement about one's own intent. One either intends to perform a given act or one does not. If a person is uncertain about whether he or she truly intends to perform a given act, indicating a firm intention to perform that act is a deliberate lie, not a reckless misstatement of fact.

5. To this end, bankruptcy courts have employed a variety of lists of objective factors that may help to determine whether a debtor intended to repay his credit card debts. One frequently cited 12–factor list was set forth in *In re Dougherty,* 84 B.R. 653, 657 (9th Cir. BAP 1988):

1. The length of time between the charges made and the filing of bankruptcy;

2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;
3. The number of charges made;
4. The amount of the charges;
5. The financial condition of the debtor at the time the charges are made;
6. Whether the charges were above the credit limit of the account;
7. Whether the debtor made multiple charges on the same day;
8. Whether or not the debtor was employed;
9. The debtor's prospects for employment;
10. The financial sophistication of the debtor;
11. Whether there was a sudden change in the debtor's buying habits; and
12. Whether the purchases were made for luxuries or necessities.

Trial Tr. at 17–18. At the time Michel began his gambling spree in July 1996 by borrowing from Citibank he was not so hopelessly insolvent as to render it inconceivable that he had a genuine intent to repay. *See* Trial Tr. at 27–28 (indicating that the bulk of Michel's unsecured debt was incurred between July and December of 1996); Pl.'s Appx. at 25 (Michel's Chapter 7 filing, indicating that aside from unsecured claims Michel's assets were almost exactly equal to his liabilities). There is no evidence that Michel was aware of (let alone motivated by) the fact that his credit card debts could be discharged in bankruptcy. Most importantly, there is nothing in the record suggesting that Michel engaged in behavior inconsistent with an intent to repay his creditors other than the fact that he gambled with borrowed money.

We acknowledge that another bankruptcy judge might have seen matters differently, finding that (1) Michel's long history of losing at gambling, (2) the objective unreasonableness of expecting to win, and (3) the sudden increase in the size of Michel's wagers roughly five months prior to filing for bankruptcy, indicate the lack of a sincere intent to repay his creditors through gambling. But the fact that reasonable minds could take different views of these facts cannot support the conclusion that Judge Barliant's view was clearly erroneous.

Our resolution of this case should not be taken as sign of broad disagreement with other courts that have refused to discharge gambling debts pursuant to § 523(a)(2)(A). Everyone agrees that gambling is an unreasonable way for an indebted person to try to regain solvency. But indebted gamblers break down into two groups: (1) those who maintain a sincere (though unreasonable) hope of winning and truly intend to repay their debts if they win, and (2) those who

fully understand that they are headed for bankruptcy, but wish to have some fun at the expense of their creditors before they file. Determining which of the two mindsets a bankrupt debtor once held is difficult, and it is no surprise that courts reach different results based on various sets of facts. Most factual scenarios involving bankrupt gamblers are sufficiently ambiguous that reasonable minds could differ regarding which of the two descriptions better fits the debtor. We would only disagree with a court that took the position that because gambling is a unreasonable way to try to make money, *all* persons who gamble while in dire financial straits lack the intent to repay their creditors.[6]

### III. Conclusion

For the foregoing reasons, the judgment of the bankruptcy court is affirmed. It is so ordered.

---

**6.** Although we have no doubt that many legitimate fraud claims are brought against bankrupt gamblers by credit card companies, we are unsympathetic to the proposition that gambling on credit is fraudulent merely because it is objectively risky. Credit card companies seem to be quite willing to accept interest payments from cardholders who run up foolish gambling debts. Some of them actually encourage gambling on credit by placing their cash machines in casinos. *See* Tr. at 4. It is troubling to us that credit card companies knowingly facilitate unwise behavior like gambling, but then turn around and argue

that gamblers are defrauding them by engaging in unwise behavior. If the use of borrowed money to gamble is unreasonable per se, why do the credit card companies not take action to prevent it? We suspect that they do not do this because—like the less sophisticated gamblers they now condemn—they are gambling that their winnings (in the form of higher interest payments from solvent gamblers) will exceed their losses (in the form of gamblers discharging their debts in bankruptcy). Having chosen to gamble, they should not be permitted to complain every time they lose.