**In re Robert SACCO and Geraldine Sacco, Debtors.**

**Commercial Money Center, Inc., Plaintiff,**

**v.**

**Robert Sacco, Defendant.**

**Bankruptcy No. 00–26365–MBM.**
**Adversary No. 00–2647–MBM.**

United States Bankruptcy Court, W.D. Pennsylvania.

Dec. 11, 2001.

Peter Pross, Eckert, Seamans Cherin & Mellott, LLC, Pittsburgh, PA, for plaintiff.

Mary Bower Sheats, Pittsburgh, PA, for debtor.

Robert H. Slone, Greensburg, PA, trustee.

## MEMORANDUM AND ORDER OF COURT

M. BRUCE McCULLOUGH, Bankruptcy Judge.

**AND NOW,** this **11th day** of **December, 2001,** upon consideration of (a) the adversary complaint of Commercial Money Center, Inc. (hereafter "CMC"), plaintiff herein, wherein CMC seeks a determination by this Court that its claim in the approximate amount of $172,000 against Robert Sacco, one of the above-captioned debtors (hereafter "the debtor"), is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6),[1] and (b) the debtor's answer and the other various pleadings and submissions of the parties; and subsequent to notice and a trial on the matter held on October 17, 2001, it is **hereby ORDERED, ADJUDGED, AND DECREED** that judgment on CMC's action under § 523(a)(2)(A) shall be, and is, **ENTERED in favor of the debtor,** and CMC's claim will consequently be **DISCHARGED** via the Chapter 7 discharge which the debtor will ultimately obtain in the instant case. The rationale for the Court's decision is set forth in some detail below.

### I.

■ 11 U.S.C. § 523(a)(2)(A) & (B) provides, in pertinent part, as follows:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, *other than a statement respecting the debtor's or an insider's financial condition;*

(B) use of a statement *in writing—*

(i) that is materially false;

(ii) *respecting the debtor's or an insider's financial condition;*

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C.A. § 523(a)(2)(A), (B) (West 1993) (emphasis added). In order for a debt to be excepted from discharge under § 523(a)(2)(A), a creditor must prove the following elements by a preponderance of the evidence:

(1) the debtor made . . . [a] representation;

(2) [at] the time of the representation, the debtor knew it to be false;

(3) the debtor made the representation with the intent and purpose of deceiving the plaintiff;

(4) the plaintiff . . . [justifiably] relied on the representation . . . ; and

(5) the plaintiff sustained a loss or damage as the proximate consequence of the representation having been made.

4 *Collier on Bankruptcy,* ¶ 523.08[1][d] at 523–43 to 44 (Bender 2001) (citing *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), to the effect that reliance required of a creditor is justifiable rather than reasonable under § 523(a)(2)(A)) & ¶ 523.08[1][e] at 523–45

---

1. CMC has informed the Court that it no longer wishes to pursue its cause of action under § 523(a)(6) against the debtor; consequently, the Court need not entertain any further that portion of CMC's present nondischargeability action.

to 46 (setting forth 5–part test); *see also, e.g., In re Orndorff,* 162 B.R. 886, 888 (Bankr.N.D.Okla.1994) (same test); *In re Homschek,* 216 B.R. 748, 751 (Bankr. M.D.Pa.1998) (same test). Furthermore, the representation made by a debtor upon which a creditor predicates an action under § 523(a)(2)(A) cannot, consistent with the express language of said provision, pertain to said debtor's financial condition; representations regarding a debtor's financial condition are only actionable under § 523(a)(2)(B), and then only if the same are made in writing. *See* 11 U.S.C.A. § 523(a)(2)(A) & (B); 4 *Collier on Bankruptcy,* ¶ 523.08[1] at 523–41; *Orndorff,* 162 B.R. at 888–890; *Homschek,* 216 B.R. at 752–753. Moreover, the Court has held in previous cases that

> representations by a debtor of his or her ability to repay a debt respect said debtor's financial condition, which representations, by virtue of the express language of § 523(a)(2), are neither actionable in any event under § 523(a)(2)(A) nor actionable under § 523(a)(2)(B) unless in writing. *See Homschek,* 216 B.R. at 752–753; *Orndorff,* 162 B.R. at

889–890 (citing ten cases); *Citibank (S. Dakota), N.A. v. Michel,* 220 B.R. 603, 605 (N.D.Ill.1998); *Anastas,* 94 F.3d at 1285.

*In re William B. Drake,* Bankr.No. 00–20220–MBM, Adv. No. 00–2167–MBM (Bankr.W.D.Pa.2000) (J. McCullough), at 17–18.[2]

## II.

The Court understands CMC to predicate its § 523(a)(2)(A) action primarily on a contention that, when the debtor and his wholly-owned corporation Faith Services Unlimited, Inc. (hereafter "Faith Services") entered into a lease of two trucks with CMC (hereafter "the Lease"), the debtor made a knowingly false representation to CMC that he would make the payments called for under the Lease. CMC maintains that this knowingly false representation was made by the debtor on February 16, 2000, which is the date when the Lease was fully executed by the parties. Because, and as the debtor concedes, the debtor is named in the Lease as a co-lessee thereunder, such alleged fraud, if proven, can be attributed to the debtor

---

**2.** The debtor contends that (a) this Court is controlled by the law of the Ninth Circuit when applying § 523(a)(2) in the instant adversary proceeding because (i) the Lease agreement between the parties provides that California law controls as to the interpretation, construction, and governance of the Lease, and (ii) California is in the Ninth Circuit, and (b) Ninth Circuit caselaw establishes that § 523(a)(2) must be applied *as of the time* when a representation is made rather than subsequent thereto (ie., the Court must ascertain whether the debtor was aware of the falsity of a representation and possessed deceptive intent with respect thereto on the date of said representation rather than subsequent thereto). The Court agrees with the debtor that pertinent Ninth Circuit law vis-a-vis the temporal focus when applying the requisite elements of § 523(a)(2) is as the debtor formulates it. *See In re Kong,* 239 B.R. 815, 823 n. 9 (9th Cir. BAP 1999). However, the

Court summarily holds as a matter of law that, because the instant bankruptcy case was commenced and remains pending in this Court, the law of the Third Circuit and not the Ninth Circuit controls with respect to this Court's application of § 523(a)(2) to the instant adversary proceeding—indeed, parties to a contract are not free to contract as to which federal circuit's law will apply respecting issues that are solely grounded in the area of bankruptcy if one of the parties subsequently files for bankruptcy, and the instant parties clearly did not attempt to so contract, instead limiting the contractual provision in question only to issues pertaining to the construction and governance of the Lease itself. Nevertheless, the Court does not understand the law of the Third Circuit or, for that matter, the law of any circuit to be contrary to that of the Ninth Circuit as it pertains to the temporal focus when applying the requisite elements of § 523(a)(2).

directly as well as indirectly by virtue of the fact that the debtor made representations on behalf of the corporation as its corporate officer. At trial, CMC additionally maintained that the debtor, also on February 16, 2000, made knowingly false representations to CMC to the effect that (a) he would maintain the two trucks (hereafter "the Trucks"), and (b) payment of the Lease obligation would be made via a corporate bank account (hereafter "the Corporate Bank Account"). Finally, the Court notes that CMC, on numerous occasions during trial and, perhaps as well, in its papers, argued that the debtor made a knowingly false representation to CMC that the debtor possessed the ability to satisfy the Lease obligation, which representation the Court presumes CMC would also contend was made on February 16, 2000.

### A. Representation by the debtor regarding ability to pay.

██ As an initial matter, the Court holds that CMC cannot prevail under § 523(a)(2)(A) with respect to any representation that the debtor may have made regarding his ability to repay the Lease obligation. The rationale for the preceding ruling is straightforward—a statement regarding the debtor's ability to repay respects the debtor's financial condition, which statement cannot be actionable under § 523(a)(2)(A) because it can only be actionable under § 523(a)(2)(B), see supra pp. 384–85. Furthermore, CMC did not point the Court, either in its papers or at trial, to any written representation by the debtor regarding his ability to repay; therefore, the Court suspects that CMC contends, as creditors often do, that the instant debtor's representation regarding ability to repay was made implicitly rather than in express written fashion. The significance of the preceding point is that representations regarding ability to repay

must also be made in writing in order that they may be actionable in any event under § 523(a)(2)(B). See supra pp. 384–85. Thus, the Court sees no reason to allow CMC to amend its complaint to plead under § 523(a)(2)(B) for to allow such amendment, the Court finds, would ultimately prove to be futile.

### B. Other representations by the debtor, to wit the statements regarding intent to repay, to repay via the Corporate Bank Account, and to maintain the Trucks.

As for the other three representations by the debtor, the Court understands CMC to allege the following in support of its position that the debtor knowingly falsely made each such representation:

(a) The debtor represented on February 16, 2000, when the Lease transaction was fully executed by the parties (i.e., when the Lease transaction closed) that he would (i) repay the Lease obligation, (ii) make Lease obligation payments from the Corporate Bank Account, and (iii) maintain the Trucks;

(b) Faith Services filed its own bankruptcy petition under Chapter 11 of the Bankruptcy Code on February 22, 2000, or only six days after the February 16, 2000 closing of the Lease transaction;

(c) Other than an advance rental payment of $5,826.15 made prior to the February 16, 2000 closing of the Lease, neither Faith Services nor the debtor made any other payments to CMC towards the Lease obligation;

(d) Faith Services and the debtor were both troubled financially on February 16, 2000, and the debtor was then aware of such financial trouble;

(e) One of the Trucks was in such poor condition several months after Feb-

ruary 16, 2000, that CMC ultimately chose not to repossess the same— the other Truck was repossessed nearly one year later but CMC realized relatively little from its resale;

(f) Faith Services ultimately closed the Corporate Bank Account when Faith Services itself entered into bankruptcy on February 22, 2000; and

(g) The debtor met with bankruptcy counsel at some point within a month prior to February 16, 2000.

Other than the allegation that he made the three representations in question on February 16, 2000, the debtor does not dispute any of the preceding factual allegations put forth by CMC. However, the debtor heartily disputes having made on February 16, 2000, the three representations alluded to above—the debtor maintains that such representations were made weeks, if not months, prior to the February 16, 2000 closing of the Lease transaction—and the parties spent much of the time at trial examining witnesses with respect to the issue of the timing of such representations. The Court now holds, for the reasons set forth below, that, even if such representations were made by the debtor on February 16, 2000, CMC nevertheless preponderantly fails to prove that any of such representations were knowingly falsely made by the debtor. As a consequence of the preceding holding, CMC necessarily (a) also fails to preponderantly establish that the debtor made the three representations in question with the intent and purpose of deceiving CMC, and (b) cannot prevail on its § 523(a)(2)(A) action with respect to such representations.

(i) *Representation by the debtor that he intended to make Lease obligation payments from the Corporate Bank Account.*

■ First, with respect to the representation by the debtor that he intended to make Lease obligation payments from the Corporate Bank Account, the Court identifies as the only evidence that such statement was knowingly falsely made on February 16, 2000, that such account was closed shortly thereafter when Faith Services commenced its own bankruptcy case on February 22, 2000. Unfortunately for CMC, such evidence does not preponderantly persuade the Court that the debtor knowingly falsely made such representation. The Court concludes as it does because, although the Court can believe that the debtor, as the sole owner of Faith Services, perhaps knew on February 16, 2000, that he would cause Faith Services to file a Chapter 11 petition shortly thereafter, the Court does not find to be credible—particularly given the Court's assessment at trial of the debtor's legal savvy— that the debtor was also aware on the same date that the filing of such bankruptcy petition would dictate the closing of the Corporate Bank Account. Instead, the Court finds much more likely that the debtor perhaps contemplated on February 16, 2000, that he would operate subsequently within a Chapter 11 case and that the Corporate Bank Account would remain open within the context of such case. In any event, the Court finds that CMC does not preponderantly prove that any representation by the debtor on February 16, 2000, that he would pay on the Lease obligation from the Corporate Bank Account was knowingly falsely made.

(ii) *Representation by the debtor that he intended to maintain the Trucks.*

■ Second, with respect to the representation by the debtor that he intended to maintain the Trucks, the Court identifies as the sole evidence that such statement was knowingly falsely made on February

16, 2000, that (a) one of the Trucks was in poor condition only several months after February 16, 2000, and (b) the other Truck generated for CMC subsequent to its repossession and resale relatively little in sales proceeds. Unfortunately for CMC, such evidence does not preponderantly persuade the Court that the debtor knowingly falsely made a representation regarding his intent to maintain the Trucks. That one of the Trucks was in poor condition only several months after February 16, 2000, does not preponderantly demonstrate to the Court that the debtor intended to harm the same when the Lease commenced on such date. As well, that the other Truck generated relatively little in sales proceeds for CMC upon its repossession and resale does not preponderantly demonstrate to the Court that such truck was harmed, let alone that the debtor intended to harm the same from the moment that the Lease commenced. Instead, the evidence at least equally supports a finding by the Court that (a) the debtor, without any volition, damaged the Truck subsequently found by CMC to be in poor condition, and (b) the other Truck was sold for relatively little after its repossession by CMC only because of a poor market for the resale of trucks, which market, of course, the debtor had absolutely no control over. Most importantly, the Court concludes as it does because CMC does not advance, and the Court cannot independently think of, any reason why the debtor, even if he intended not to repay the Lease obligation as of the February 16, 2000 Lease closing date, would also have intended on that date to subsequently harm the Trucks. Without a reason for harming the Trucks, the Court certainly will not find that the debtor harbored an intent on February 16, 2000, to harm the Trucks. In light of the foregoing, the Court must conclude that CMC does not preponderantly prove that any representation by the debt-

or on February 16, 2000, that he would maintain the Trucks was knowingly falsely made.

### (iii) *Representation by the debtor that he intended to repay the Lease obligation.*

█ Finally, as for the representation by the debtor that he intended to repay the Lease obligation, CMC relies primarily on the following collective evidence to support its allegation that such statement was knowingly falsely made on February 16, 2000, to wit that (a) Faith Services filed for bankruptcy on February 22, 2000, (b) Faith Services and the debtor were both in financial trouble on February 16, 2000, and the debtor was then aware of such financial trouble, (c) the debtor met with bankruptcy counsel at some point within a month prior to February 16, 2000, and (d) neither Faith Services nor the debtor made any payments to CMC towards the Lease obligation other than the $5,826.15 advance rental payment which was made prior to February 16, 2000. Unfortunately for CMC, such evidence, even if viewed collectively, does not preponderantly demonstrate to the Court either that the debtor misrepresented, or that the debtor knowingly misrepresented, his intent to repay the Lease obligation. The preceding conclusion is dictated for several reasons.

First, the debtor, on behalf of Faith Services, filed on February 22, 2000, a Chapter 11 petition rather than a Chapter 7 petition. Had Faith Services filed for Chapter 7 protection only six days after February 16, 2000, then such bankruptcy filing would have constituted much more probative evidence that the debtor did not, either through Faith Services or by himself, intend as of February 16, 2000, to repay the Lease obligation. Unfortunately for CMC, however, the filing of a Chapter

11 petition, even if done within such a short time span as was the case herein, only tells the Court that the debtor perhaps had a strong inclination on February 16, 2000, to reorganize the business of Faith Services; such filing does not tell the Court that the debtor did not intend to honor the terms of the Lease. Moreover, that the debtor did not file for Chapter 7 protection on his own behalf until August 15, 2000, even though the debtor knew, at a minimum, that he was personally liable on the Lease as a guarantor, tends strongly to indicate to the Court that the debtor, through Faith Services, intended on February 16, 2000, to repay the Lease obligation, albeit potentially within the context of a Chapter 11 bankruptcy case; indeed, if the debtor never had any intent to repay the Lease obligation on behalf of Faith Services or on his own behalf, then the Court would expect that the debtor would have filed Chapter 7 petitions for both himself and Faith Services shortly after February 16, 2000.

Second, that Faith Services and the debtor were both in financial trouble on February 16, 2000, and that the debtor was then aware of such financial trouble, as well as the fact that the debtor met with bankruptcy counsel at some point within a month prior to February 16, 2000, certainly lends credence, the Court finds, to the allegation that the debtor, on February 16, 2000, harbored an inclination then to file a Chapter 11 petition for Faith Services shortly after such date. Unfortunately for CMC, the aforesaid evidence, for the reasons expressed in the preceding paragraph, does not persuade the Court that it is more likely than not that the debtor also harbored an intent on February 16, 2000, to dishonor the terms of the Lease; at best, such evidence tends to demonstrate only that it is equally likely that the debtor intended on February 16, 2000, not to pay on the Lease obligation, which is insuffi-

cient for CMC given that CMC, in order to succeed under § 523(a)(2)(A), must prove that the same is more likely than not to have been the case. As for the fact that the debtor made only the advance payment on the Lease obligation prior to February 16, 2000, and then no payment subsequent thereto, the Court likewise finds that such evidence is equally susceptible of an explanation that the debtor, although intent on repaying such obligation within the context of a Chapter 11 case, was ultimately, indeed, utterly unsuccessful in executing such intent.

Third, and perhaps most importantly, the Court cannot arrive at a finding that the debtor knowingly falsely represented his intent to repay the Lease obligation when he and Faith Services entered into the Lease on February 16, 2000, unless the Court can identify a motive for such an action by the debtor. Unfortunately for CMC, the Court cannot identify such a motive, particularly given that (a) the Trucks constituted collateral for the Lease obligation, (b) the debtor was aware from the outset of the Lease that the Trucks constituted such collateral, (c) a reasonable person would have thought, and rightly so, that a secured lessor, such as was CMC, would repossess the Trucks shortly after the cessation of payments on the Lease obligation, and (d) the debtor must have thought, therefore, that CMC would quickly repossess the Trucks if the debtor stopped making payments on the Lease obligation. Put differently, a finding of fraud is difficult for a court to make unless the alleged tortfeasor can be found to have schemed to obtain a benefit from the fraud, and this Court is troubled by the fact that this debtor knowingly obtained very little benefit if, in fact, he also engaged in a knowing misrepresentation to CMC. CMC would, no doubt, point the Court to the fact that a debtor/lessee, if he

fraudulently schemes to obtain property that constitutes collateral for an obligation, knows that he will likely be able to use such property for a minimal period of time before repossession, such as perhaps several months—CMC would undoubtedly argue that this constitutes benefit to a debtor/lessee. Unfortunately for CMC, the Court is now asked to, but simply cannot, find that the debtor knowingly schemed to obtain the usage of the Trucks for such a minimal period and that, as consideration therefore, he not only burdened his company but himself personally for an obligation that now approximates $172,000; indeed, the only way that the Court could make such a finding is if the Court were to also find that the debtor only needed the use of the Trucks for such a minimal period, which finding, in turn, is neither suggested to the Court by CMC nor supported by the evidence. The Court points out that motive in borrowing money or purchasing property and then immediately filing for bankruptcy is readily ascertainable when unsecured consumer debt is at issue—indeed, cases involving such "loading up" on debt or engagement in "a spending spree on the eve of bankruptcy" are so prevalent that they provided ultimately the impetus for the legislation that is now codified at 11 U.S.C. § 523(a)(2)(C). Unfortunately for CMC, such motive is much harder to prove when secured business debt—such as is the Lease obligation—is involved, and such difficulty is only partly due to the fact that the presumption of fraud via § 523(a)(2)(C) does not attach to such debt.

Therefore, and in light of the foregoing, the Court must conclude that CMC does not preponderantly prove that any representation by the debtor on February 16, 2000, that he would repay the Lease obligation was knowingly falsely made.

### III.

IN SUMMARY, judgment on CMC's action under § 523(a)(2)(A) is entered in favor of the debtor, and CMC's claim will consequently be discharged via the Chapter 7 discharge which the debtor will ultimately obtain in the instant case.