**In re Deborah Anne HOSTETTER, Debtor.**

**MBNA America Bank, N.A., Plaintiff,**

**v.**

**Deborah Anne Hostetter, Defendant.**

**No. 04–60973 JPK.**

**Adversary No. 04–6084.**

United States Bankruptcy Court, N.D. Indiana, Hammond Division.

Feb. 23, 2005.

---

W. Randall Kammeyer, Hawk, Haynie, Kammeyer & Chickedantz, LLP, Fort Wayne, IN, for Plaintiff.

### JUDGMENT DETERMINING DISCHARGEABILITY OF INDEBTEDNESS

J. PHILIP KLINGEBERGER, Bankruptcy Judge.

This adversary proceeding was commenced by a complaint filed by the plaintiff MBNA America Bank, N.A. ("MBNA") against Deborah Anne Hostetter ("Hostetter") on May 17, 2004. Hostetter is the debtor in a Chapter 7 case filed under case number 04–60973 in the United States Bankruptcy Court for the Northern District of Indiana, Hammond Division. The record establishes that a copy of both the summons and complaint was served upon both Deborah Anne Hostetter and upon her Chapter 7 counsel Walter E. Melion, as evidenced by the returns of service of process filed on May 27, 2004 and June 28, 2004. The record also establishes that no appearance has been filed on behalf of Hostetter, and that Hostetter has not filed an answer or other response to the complaint.

The Court entered an order on August 8, 2004 directing MBNA to file a motion for default judgment. Entry of default was made by the Clerk of the Court on the same date, and on October 15, 2004, MBNA, by counsel, filed a motion for default judgment. On December 8, 2004, pursuant to Fed.R.Bankr.P. 7055/Fed. R. Civ. P. 55(b)(2), the Court held a telephonic conference with MBNA's counsel to discuss the nature of proof required in order

to make certain that the allegations of the complaint and the motion for default judgment were established by appropriate evidence. On December 9, 2004, MBNA filed a Memorandum in Support of Motion for Entry of Default. The case is now before the Court for review of the motion for default judgment.

MBNA asserts that Hostetter's debt to it is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and N.D.Ind. L.R. 200.1. This adversary proceeding is a "core proceeding" as defined by 28 U.S.C. § 157(b)(2)(I), and thus this Court has jurisdiction to enter a final judgment on the complaint.

### I. *Standards for Review of Motions for Default Judgment*

The basic procedural provision with respect to judgment by default is provided by Fed.R.Civ.P. 55(b)(2), made applicable to adversary proceedings by Fed.R.Bankr.P. 7055. That provision in pertinent part states:

> (b) Judgment. Judgment by default may be entered as follows:
>
> . . .
>
> (2) By the Court. In all other cases the party entitled to a judgment by default shall apply to the court therefor: ... If, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearings or order such references as it deems necessary and proper ...

The fact that a plaintiff is entitled to an entry of default does not entitle the plaintiff to the entry of judgment by default. As explained in *In re Sanchez,* 277 B.R. 904, 907 (Bankr.N.D.Ill.2002):

> Rule 7055(b)(2) Fed.R.Bankr.P. governs default judgments entered by a bankruptcy court. A movant is not entitled to default judgment as a matter of right even though the debtor is in default under Rule 55(a) [Fed.R.Bankr.P. 7055(a)]. *Lewis v. Lynn,* 236 F.3d 766, 767 (5th Cir.2001). Panels in this Circuit have eschewed traditional notions disfavoring default judgments. *Stafford v. Mesnik,* 63 F.3d 1445, 1450 (7th Cir.1995); *Profile Gear Corp. v. Foundry Allied Industries, Inc.,* 937 F.2d 351, 354 (7th Cir. 1991); *Matter of State Exchange Finance Co.,* 896 F.2d 1104, 1106 (7th Cir.1990). However, in the bankruptcy context, where a debtor has a presumptive right to a discharge, default judgment motions should not be granted unless the movant shows that its debt is nondischargeable as a matter of law. *Valley Oak Credit Union v. Villegas,* 132 B.R. 742, 746 (9th Cir. BAP 1991) (court must determine whether plaintiff is entitled to judgment); *In re McArthur,* 258 B.R. 741, 746 (Bankr.W.D.Ark.2001) (noting that bankruptcy courts have taken a conservative approach and sometimes refrain from granting default judgment motions which deprive debtor of discharge).

Thus, the issue here is whether Plaintiff has shown at least *prima facie* facts meeting the legal requirements to except a debt from discharge under § 523(a)(2)(A).

As explained by the Bankruptcy Appellate Panel of the Ninth Circuit in *Valley Oak Credit Union v. Villegas,* 132 B.R. 742, 746 (9th Cir. BAP 1991):

The court has wide discretion in determining whether to enter a default judgment under Rule 55. See generally 10 C. Wright, A. Miller and M. Kane, Federal Practice and Procedure Civil 2d § 2685 (1983). Similarly, a trial court has broad discretion as to the nature of the hearing that it will hold pursuant to Rule 55(b)(2) in determining whether to enter a default judgment. This language of the rule itself confirms the discretion of the trial court to hold such hearings "as it deems necessary and proper." Fed. R.Civ.P. 55(b). This provides the trial court with discretion to require, at a hearing under Rule 55(b)(2), some proof of the facts that are necessary to a valid cause of action or to determine liability. See *Peerless Industries, Inc. v. Herrin Illinois Café, Inc.*, 593 F.Supp. 1339, 1341 (E.D.Mo. 1984), *aff'd without opinion* 774 F.2d 1172 (8th Cir.1985); Wright, Miller and Kane, at § 2688.

Because of the impact of a nondischargeability action on the "fresh start" arising from the entry of an order of discharge pursuant to 11 U.S.C. § 727(a), bankruptcy courts are particularly reluctant to "rubber stamp" motions for default judgments in adversary proceedings filed to determine dischargeability of indebtedness, particularly in circumstances where averments of the complaint are largely conclusory; *In re Sziel*, 206 B.R. 490, 492–493 (Bankr. N.D.Ill.1997).

■ In establishing the basic facts of record upon which the Court is to review a motion for default judgment, the United States Court of Appeals for the Seventh Circuit follows the rule that "upon default, the well-pleaded allegations of a complaint relating to liability are taken as true, [but] allegations in a complaint relating to the amount of damages suffered ordinarily are not," *US v. Di Mucci*, 879 F.2d 1488, 1497 (7th Cir.1989); *Dundee Cement Company v. Howard Pipe & Concrete Products, Inc.*, 722 F.2d 1319, 1323 (7th Cir.1983); *Merrill Lynch Mortgage Corp. v. Narayan*, 908 F.2d 246, 253 (7th Cir.1990).

## II. *Status of the Record*

Hostetter filed her Chapter 7 case on March 3, 2004, which the Trustee determined to be a no asset case. On May 27, 2004, MBNA filed its complaint, alleging that the debtor falsely represented that she intended to repay the charge account with which she purchased goods and obtained a cash advance. The creditor requested that the credit card debt be found nondischargeable under § 523(a)(2)(A).[1] The Court's order discharging the debtor was issued on June 21, 2004.

Accepted as true under the well pleaded complaint rule, Section II of the complaint establishes that Hostetter had a charge account with MBNA. "Exhibit A", an Account Holder Information, provided by the creditor with its Memorandum in Support of Motion for Entry of Default, establishes that Hostetter had a credit limit of $5,000.00. That document also establishes that between September 29, 2003 and November 4, 2003, Hostetter accumulated $179.85[2] in retail charges. Further, between September 29, 2003 and November 4, 2003, *via* a convenience check, she in-

---

1. The presumption of nondischargeability under § 523(a)(2)(c) is not applicable because the charges were not made on the creditor's account within sixty days prior to bankruptcy, as that subsection requires.

2. Plaintiff, in paragraph 8 of its complaint, states that the defendant accumulated $208.85 in retail charges. However, according to Statement Facsimile of the account holder (Exhibit A), 3 charges were made: $64.05 + $21.34 + $94.46 equals to $179.85.

curred a charge of $4,800.00, in addition to a $50.00 transaction fee [Complaint ¶ 9 and Exhibit A]. All charges were incurred during a period beginning 160, and ending 124, days prior to the initiation of Hostetter's bankruptcy. On December 31, 2003, Hostetter made a payment of $30.00, the only payment she ever made on MBNA's account. As of March 10, 2004, Hostetter's balance on the charge card was $5,574.70, which, in addition to the above charges, included late fees, over-limit fees, and interest[3]. [Exhibit A].

Hostetter's Statement of Financial Affairs states that her income in 2003, the year prior the filing of the chapter 7 petition, was $400.00, and that her income in 2002 was $3,000.00. On Schedule J, Hostetter stated that her current monthly expenditures included a rent or home mortgage payment of $400.00; a payment for utilities of $100.00; and expenditures for food of $200.00. Based on the information contained in the schedules, and the lack of information that would indicate to the Court to the contrary, it is to be assumed that Hostetter had the same or similar expenses in 2003, the year in which she incurred her debt to MBNA. More importantly, Schedule F of Hostetter's schedules establishes that credit card debt constituted 89% of her total debt on the date of the filing of the petition. Although this figure is based on debtor's schedules filed not less than 124 days after the charges in questions were incurred, the Court infers that a substantial amount of the $169,478.00 in credit card debt stated in Schedule F, if not all of it, was due and owing between September 29, 2003 and November 4, 2003, the time of the accrual of the MBNA debt.

### III. *Legal Analysis*

The issue in this case is whether Hostetter's obligation to MBNA is excepted from her discharge under § 523(a)(2)(A) of the Bankruptcy Code. That section provides that an individual debtor is not discharged from any debt—

(2) for money, property, services, or extension, renewal or refinancing of credit, to the extent obtained by—

(A) false pretenses, false representation, or actual fraud.... [4]

---

**3.** Exhibit A does not state the interest rate applicable to the debtor's charge card.

**4.** As stated in *Sziel v. AT & T Universal Card Services, Corp.*, 206 B.R. 490, 493 (Bankr. N.D.Ill.1997), this sub-section is not well-suited to credit card debts, but unless the charges come under § 523(a)(2)(C), and due to the lack of any special credit card exception to discharge, it is the only discharge exception generally available to challenge credit card debts. The same can be said for actions based upon "bad" checks, i.e., checks simultaneously exchanged for the acquisition of goods or services: § 523(a)(2)(A) provides essentially the sole ground for nondischargeability.

11 U.S.C. § 523(a) provides no clear mechanism for precluding the dischargeability of several forms of what is in essence theft by deception. Primary among these are the obtaining of services, property or credit by means of a form of promise which the promissor has no intention of honoring at the time the promise is made, in the absence of which the promisee, not aware of the promissor's guile, would not have provided the property, service or credit to the promissor. Many adversary proceedings in this genre pursue nondischargeability based on alleged fraudulent use of a credit card or the issuance of a "bad" check. Other cases· assert nondischargeability based upon the alleged fraudulent intent of the promise itself, without the intermediary mechanism of a swiped credit card or of a given check, in essence contending that what may appear to be simply a contractual breach is in actuality a fraudulent artifice because at the time of entering into the contract the promissor never intended to honor his/her obligations under the contract.

The most common approach to seek nondischargeability of these forms of theft by deception is to pursue an action under 11 U.S.C. § 523(a)(2)(A). This is as it should be. This form of fraudulent conduct clearly

■ Although the precise formulation and specification of the number of elements varies from decision to decision, in order to sustain a *prima facie* case of fraud under § 523(a)(2)(A), courts have traditionally required a creditor to establish that: (1) the debtor made a representation to the creditor; (2) at the time of the representation, the debtor knew it to be false or the representation was made with such reckless disregard for the truth as to constitute willful misrepresentation; (3) the debtor made the representation with the intent and purpose of deceiving the creditor; (4) the creditor relied on the representation resulting in a loss to the creditor; and (5) the creditor's reliance was justifiable;[5] *In re Sheridan,* 57 F.3d 627, 635 (7th Cir.1995); *Mayer v. Spanel Int'l, Ltd. (In re Mayer),* 51 F.3d 670, 673, 676 (7th Cir.), *cert. denied,* 516 U.S. 1008, 116 S.Ct. 563, 133 L.Ed.2d 488 (1995); *In re Maurice,* 21 F.3d 767, 774 (7th Cir. 1994). The creditor must prove each element by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991); *In re Bero,* 110 F.3d 462, 465 (7th Cir.1997). Finally, "exceptions to discharge are to be construed strictly against a creditor and in favor of the debtor." *In re Scarlata,* 979 F.2d 521, 524 (7th Cir.1992), reh. en banc den.1993; *In re Zarzynski,* 771 F.2d 304, 306 (7th Cir.1985).

■ Under the foregoing standards, the Court deems that a representation is clusively by 11 U.S.C. § 523(a)(2)(A), or it escapes the net of nondischargeability entirely.

As explained by the Seventh Circuit Court of Appeals in *McClellan v. Cantrell,* 217 F.3d 890 (7th Cir.2000), § 523(a)(2)(A) has three *distinct* forms of conduct which can lead to nondischargeability: false pretenses, false representation, or actual fraud. A representation is not necessary if actual fraud can be established; because actual fraud is broader than misrepresentation, it can be defined as "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *McClellan,* 217 F.3d at 893 citing 4 *Collier on Bankruptcy* ¶ 523.08[1][e], o. 523–45 (15th ed., Lawrence P. King Ed., 2000). As this Court construes § 523(a)(2)(A), most garden variety credit card and bad check cases will rise or fall under the "false representation" portion of the statute. There may be cases, however, in which a plaintiff with this type of case may not be able to establish a false representation but can still establish actual fraud: the deviations of the human mind are myriad and clever, and the circumstances of each case can only be judged against the applicable legal standards.

---

doesn't fall within the ambit of 11 U.S.C. § 523(a)(4), requiring as that section does that the conduct arise in a fiduciary capacity, or involve embezzlement or larceny. Some actions attempt to fit the fraudulent conduct into 11 U.S.C. § 523(a)(6), a very difficult proposition unless the concept of "property" in that section is expanded to include the right to receive payment for the goods or services provided or the credit extended. This is simply too much of a stretch: § 523(a)(6) was meant to deal with more corporeal torts, actions which affect a body or a tangible thing, or a pecuniary relationship. A "willful and malicious injury" connotes an act of aggression, not an act of deception. The simple failure to pay for something obtained from another—the failure to keep a promise to pay—even if the failure was intended from the start, does not give rise to the form of injury intended by Congress to be brought within the ambit of § 523(a)(6). This conclusion is more than buttressed by the legislative intent evidenced by the enactment of 11 U.S.C. § 523(a)(2)(c), which provides a presumption of nondischargeability for the obtaining of certain types of goods, services and extensions of credit by the use of a mere promise to pay for them. This Court deems this insertion by Congress of a form of theft by deception into § 523(a)(2) to conclusively evidence that this form of tortious conduct—obtaining of property, services or an extension of credit by a fraudulently made promise to pay for the item obtained—is covered ex-

5. In *Field v. Mans,* 516 U.S. 59, 70, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995), the Supreme Court held that a creditor's reliance need only be justifiable, not reasonable.

made by the user of a credit card each time the card is used to obtain an advance of credit or a cash advance. Similarly, a representation is made when a check is given in simultaneous exchange for the acquisition of goods or a service. The use of the credit card or the delivery of the check constitutes a promise to pay: *In re Murphy,* 190 B.R. 327 (Bankr.N.D.Ill. 1995); *In re Faulk,* 69 B.R. 743, 755 (Bankr.N.D.Ind.1986) ["the use of the credit card is a statement of a present intention to pay at the time of purchase rather than an unwritten representation of the ability to pay or financial condition"]. As stated by Chief Judge Harry C. Dees, Jr. in *Citibank (South Dakota), NA v. Ziegert,* Proc. No. 03–3090, at pg. 6 (Bankr.N.D.Ind. August 3, 2004) [unpublished decision]:

> (S)ome courts adhere to the position that "whenever a credit holder uses a credit card, he impliedly represents that he has the ability and the intention to pay for the charges incurred. The most comprehensive analysis of this matter has been presented by the Fifth Circuit Court of Appeals in *AT & T v. Mercer (In re Mercer),* 246 F.3d 391 (5th Cir.2001) (en bank), which reversed the bankruptcy court's post-trial finding that the credit card debt was dischargeable ... [t]he majority held that, for each use of the credit card, as a matter of law, the debtor 'represented her intent to pay the loan; *if her representation was knowingly false,* she intended to deceive [the creditor]; it actually relied on the representation by authorizing the requested loan; and its loss was proximately caused by such reliance.' "

The representation is that the cardholder will pay for the advance of credit/cash advance according to the terms of his/her contract with the card issuer, or that when presented for payment, the check will be honored. But the use of the card/the delivery of the check is nothing more than this promise: it is not a representation that *at the time of use or delivery,* the user/payor has the then-present ability to pay when the card statement arrives or the check is presented. This holding is in conformity with, and is compelled by, the cases of *Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) and *In re Scarlata,* 979 F.2d 521, 525 (7th Cir.1992). *Williams* involved a criminal statute [18 U.S.C. § 1014] and determined that knowingly passing a bad check is not a "false statement", as required for conviction under that statute. The Court reasoned that "a check is not a factual assertion at all"; a check "serve[s] only to direct the drawee bank to pay the face amounts to the bearer ...". *Williams,* 458 U.S. at 284, 102 S.Ct. 3088. The *Scarlata* court found no difference between the construction of the criminal statute in *Williams* and the construction of 11 U.S.C. § 523(a)(2)(A) in the context of the element of "false pretense" in the passing of a bad check, and thus held that a "creditor cannot rely solely on the existence of an NSF check ... to establish a misrepresentation for § 523(a)(2) purposes" [citing *In re Hunt,* 30 B.R. 425, 438 (M.D.Tenn.1983) ]; *Scarlata,* 979 F.2d at 525. Thus, the fact of nonpayment of a credit card statement or of dishonor of a check is not evidence of scienter, i.e., the knowledge and intent of the user/drawer, *at the time of use or delivery,* that payment will not be made for whatever was acquired by the use of the card or delivery of the check. Thus, the presentment of a credit card for charge, or the delivery of a check in payment, is not a *factual* assertion that the presenter/deliverer has the present ability to repay the debt: those

acts constitute only a promise to repay a debt in the future.

What then is the type of conduct evidenced by the delivery of a "bad" check, the failure to pay a credit card statement, or the failure to honor a contractual promise to pay which § 523(a)(2)(A) is intended to cover? It is the most egregious of conduct, *an intent from the inception of the transactional relationship* to obtain something of value and to never pay for it. The intent to commit theft, if you will, must exist at the inception of each transaction with the creditor. An intervening event which inhibits or even precludes the promissor's ability to pay, absent the promissor's intent not to pay from the inception of the transactional relationship with the promissee, will not give rise to a nondischargeable debt.

 The mere fact that the promissee subsequently failed to make good on his promise has no probative value in establishing the necessary element of scienter, which under the five-element test stated on page 7 requires both knowledge of the falsity of, or reckless disregard for, the truth of the promise, and the intent that the promissee would part with a good, a service or an extension of credit based upon the promise known to be false, or recklessly made. In nearly all cases, establishing the knowledge/reckless disregard element (element 2 on page 7) will establish the intent element (element 3 on page 7). But perhaps not always. When asked by a literary critic to explain the basis of the sometimes incredible circumstantial plot elements of his novels, the great Russian writer Fyodor Dostoevsky responded that he collected newspaper clippings reporting odd human behaviors, and that he could never duplicate in fiction the sometimes extreme manifestations of actual human conduct or thought. While knowledge of falsity/reckless disregard of

truth, and intent to deceive, are usually hand-in-glove due to the circumstantial convolutions of the human mind, there may be instances in which these elements do not coalesce. In a default context, a *prima facie* case of knowledge/reckless disregard will in this Court's view, *ipso facto* establish intent to deceive. However, in a non-default context, that may not be true depending on the evidence submitted by the debtor/defendant. Very few smoking guns, or even smoking witnesses, are found by the discovery of a bar confidant to whom the debtor confided that he used his credit card to get his plasma TV and the sucker credit card issuer never knew he was never going to pay a dime to it. Because most creditors have no smoking bar mate to offer as a witness, establishing this element will almost always require the extensive use of circumstantial evidence: evidence which can lead to the conclusion that the promissee never intended to pay, or had no objective ability to pay, as he had promised. In the context of theft by deception, reliance by the promissor is almost a presumption, unless the debtor can offer proof to the contrary: in the realm of the real world, absent a gift or devise, hardly anyone ever parts with a thing of value for which he has been promised payment without expecting payment. Damage arises from the fact that the promise has been breached: the damage is the value ascribed to the good, service, or credit extension for which payment has not been received.

 The element of scienter is most difficult to establish in a default context. Be that as it may, the burden of proof required of a creditor to sort out a "bad actor" from a mere contract breacher doesn't change. Fed.R.Bankr.P. 9011 states that the filing of a complaint is a representation/certification that the claims asserted "are warranted by existing law or

by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law," and a representation/certification that the claims asserted "have evidentiary support, or if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Likewise, the filing of a motion for judgment by default constitutes the movant's certification that the plaintiff can at that time present admissible evidence that establishes a *prima facie* case of nondischargeability. Developing a *prima facie* case of circumstantial scienter prior to the filing of an adversary proceeding can be undertaken in many ways: analysis of the Schedules and Statement of Affairs in the debtor's main case; examination of the debtor at the § 341 meeting; a Rule 2004 examination, coupled with a motion to extend the time for filing an adversary complaint pursuant to B.R. 4007(c). After the complaint is filed, all of the discovery devices of Part VII of the Federal Rules of Bankruptcy Procedure are available to the creditor to develop its case, whether or not the debtor ever appears or answers in response to the complaint.

 What evidence will be probative to establish a *prima facie* case? In the circumstance of a credit card case, it is evidence that the debtor—based on his/her income, fixed expenses and debt structure at the time of the obtaining of a credit advance—either could not possibly have made even the minimum payments on the card while keeping current with other obligations, or should have reasonably known that he/she could not do so. Bunched credit transactions, or multiple unpaid transactions with several or more creditors, shortly before the filing of the case may be probative of intent when coupled with "financial feasibility" evidence. In the circumstance of a check, evidence of the manner of the debtor's handling of the account on which the check was drawn is sometimes illuminating, again coupled with "financial feasibility" evidence. In the context of a dishonored check, Indiana law is instructive, although not binding on this Court. I.C. 26–2–7–3, et seq. provides penalties upon the drawer for the knowing nonpayment of a check by the drawee. The trigger for these penalties is the provision of written notice of dishonor by the payee to the drawer **by certified mail** [I.C. 26–2–7–6(b); *See*, I.C. 26–2–7–8] coupled with the drawer's failure to respond or to pay the amount of the check within a stated period of time.[6] In the Court's view, this form of notification *coupled with the complete failure of the debtor to respond either by any payment or any communication,* has some probative value with respect to intent. However, again, the mere fact that a check is not paid when presented will not *prima facie* establish the scienter element.[7]

The bottom line is that the defendant must have made the representation of the

---

**6.** The provision that dishonor of a check constitutes *prima facie* evidence that the drawer knew that a check would be dishonored, as stated in I.C. 35–43–5–5(c), is inconsistent with this Court's interpretation of 11 U.S.C. § 523(a)(2)(A).

**7.** There are all kinds of reasons why a check is dishonored upon presentment, and many of them have nothing to do with fraudulent intent: math errors, garnishments, set-offs by the bank, freezes imposed on accounts, dishonoring or late payment of checks deposited into the account to cover the checks written on the account, or even the assumption of the receipt of funds which were not received due to no fault of the account holder—to name a few. The same can be said for a failure to pay current credit card statements, given that most people pay their bills from a demand deposit account.

promise to pay with the intent and purpose of deceiving the creditor; i.e., intentional/actual fraud. As eloquently stated by the Honorable Kent Lindquist:

> This finding of fact as to intention will obviously have to be determined by circumstantial evidence in most cases as direct evidence of the Defendant's state of mind at the time of purchase is seldom expressly indicated. Although this is certainly a difficult task, it is no greater a task than any other cause of action that includes intent or state of mind as a necessary element. And the existence of fraud may be inferred if the totality of the circumstances present a picture of deceptive conduct by the Debtor which indicates he intended to deceive or cheat the creditor. *In re Fenninger,* 49 B.R. 307, 310, *supra; In re Taylor,* 49 B.R. 849, 851, *supra.* The Court may logically infer this intent not to pay from the relevant facts surrounding each particular case. *See, In re Kimzey,* 761 F.2d 421, 424, supra. And a person's intent, his state of mind, has been long recognized as capable of ascertainment and a statement of present intention is deemed a statement of a material existing fact sufficient to support a fraud action. *In re Pannell,* 27 B.R. 298, 302 (Bankr. E.D.N.Y.1983).

*In re Faulk,* 69 B.R. 743, 755 (Bankr. N.D.Ind.1986).

▮▮▮▮ Courts must consider objective evidence that is probative of the debtor's intent to repay in addition to considering the debtor's demeanor (in a case determined by trial), but the ultimate inquiry still seeks to determine the debtor's subjective intent. *Citibank (South Dakota), N.A. v. Michel,* 220 B.R. 603, 606 (N.D.Ill. 1998), *In re Faulk,* 69 B.R. 743 (Bankr. N.D.Ind.1986). In determining whether debts were incurred with no intention to repay them, many courts look at the totality of circumstances. A non-exclusive list of factors has been promulgated by various courts to aid in the determination of debtor's intention to deceit. Those factors are:

1. The length of time between the charges made and the filing of bankruptcy;

2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3. The number of charges made;

4. The amount of the charges;

5. The financial condition of the debtor at the time the charges are made;

6. Whether the charges were above the credit limit of the account;

7. Whether the debtor made multiple charges on the same day;

8. Whether or not the debtor was employed;

9. The debtor's prospects for employment;

10. The financial sophistication of the debtor;

11. Whether there was a sudden change in the debtor's buying habits; and

12. Whether the purchases were made for luxuries or necessities.

*Michel,* 220 B.R. at 606, *Faulk,* 69 B.R. at 757. *See also Sears, Roebuck & Co. v. Green (In re Green),* 296 B.R. 173, 180 (Bankr.C.D.Ill.2003)(evaluating debtor's intent by considering factors to determine whether "it is more probable than not that the debtor had the requisite fraudulent intent"); *In re Jacobs,* 196 B.R. 429, 434 (Bankr.N.D.Ind.1996) ("a determination of whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudu-

lent intent"). The *Jacobs* court found that the eight cash advances taken by the debtors in the six months prior to bankruptcy were used to make purchases of in excess of $6,000.00. Because the debtors knew or should have known that they could not pay for those charges, the court found that the debtors "perpetrated a fraud upon" the creditor. *Id.* at 434.

█ Now, turning to the facts in this case as presented on the record, the Court concludes that the totality of circumstances establishes that Hostetter falsely represented that she would pay MBNA and intended to deceive the creditor when she used her credit card. Hostetter's Schedules state $0.00 in secured debt, but $189,879.00 in unsecured debt, $169,478.00 of which is credit card debt. Schedule I states monthly take home pay of $325.00, while Schedule J states monthly expenses of $890.00, the difference being a negative monthly balance of $565.00. The Statement of Financial Affairs shows that Hostetter made $0.00 year-to-date in the petition year, and that during the year in which she incurred the charges to the MBNA card [charges comprised of a $64.05 charge at Sephora, a $21.34 at The Disney Store, a $94.46 charge at IFR Deep Discount DVD, in addition to a $4,800.00 cash advance with a check transaction fee of $50.00 related to it] her income was $400.00. In 2002—the year prior to the MBNA charges—Hostetter made a total of $3,000.00. Schedule F discloses $169,478.00 in credit card debt, and it is interesting to note that Hostetter lacks any assets that would normally be realized from extensions of credit totaling $169,478.00. Schedule B states that on the petition date she had $2,385.00 worth of household goods & furniture, $200.00 worth of clothing, $100.00 in cash, a 1990 Buick worth $100.00 and a 1992 Pontiac worth $300.00. Schedules A and D state that she did not own any real estate, and that she had no secured creditors; consequently, Hostetter's incredibly extensive incursions of credit card debt cannot be explained by the use of credit from one creditor to "save the house" or to "save the car" subject to secured debts of other creditors. In summary, 100% of Hostetter's debt is comprised of credit card debt and of debt owed to various department stores. The foregoing facts clearly establish that at the time Hostetter incurred her indebtedness to MBNA, she had no ability to repay it, a fact which she either knew or recklessly disregarded when she incurred the MBNA debt. The record establishes in this case that she intended to deceive MBNA.

Hostetter made only one $30.00 payment on $5,029.85 [8] of charges on her MBNA account, an account indebtedness of $5,574.70 (including over limit fees, late fees and interest) on the date of her petition. Although one may argue that a payment of $30.00 negates the proposition that Hostetter had no present intent to repay the debt at the time she obtained the extensions of credit, a *de minimis* or token payment such as the one made in this case will not save the day.

Based on the totality of circumstances established by the record, the Court finds that MBNA has established a *prima facie* case that Hostetter had no present intention to pay for the extensions of credit she obtained from MBNA, that she intended to deceive MBNA by her promise effected by

8. {$4,800 + $50.00 + $64.05 + $21.34 + $94.46 = $5,029.85}. Plaintiff, in paragraph 8 of its complaint, however, states that "between 09/29/2003 and 11/04/2003, defendant accumulated $208.85 in retail charges". A review of Exhibit A, the statement of the Account Holder Information, and taking out the cash advance and its affiliated fee, indicates the total sum of $179.85 in retail charges was incurred.

the use of her credit card, and that the extensions of credit were therefore obtained by her by false representations under the criteria of 11 U.S.C. § 523(a)(2)(A).

IT IS ORDERED, ADJUDGED AND DECREED that MBNA's motion for default judgment is granted.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Deborah Anne Hostetter's debt to MBNA in the sum of $4,999.85 [9] plus prejudgment interest at the rate of 8% per annum from February 4, 2005 to the date of entry of judgment pursuant to I.C. 34–51–4–8(a) [10] is excepted from her discharge pursuant to § 523(a)(2)(A).

⋅ IT IS FURTHER ORDERED, ADJUDGED AND DECREED that MBNA is not entitled to the recovery of attorney's fees.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that MBNA is entitled to recover its costs from the defendant, in the amount of $150.[11]

---

**9.** Given the fact that the defendant made a $30.00 payment on the total charges of $5,029.85, it is unclear to the Court how the plaintiff arrived at a figure of $5,008.85.

**10.** I.C. 34–51–4–1 provides that the chapter applies to "any civil action arising out of tortious conduct." Actions under 11 U.S.C. § 523(a)(2)(A) are premised on the tort of fraud, not on civil contract theories, and thus I.C. 34–51–4–1 applies to this action: *See, Cohen v. de la Cruz,* 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). The accrual date for MBNA's action under I.C. 34–51–4–8 is deemed by the Court to be the *later of* 15

months after the last charge made by Hostetter (November 4, 2003;) or 6 months after the filing of the complaint (May 27, 2004; November 27, 2004), which causes the accrual date to be February 4, 2005.

**11.** This judgment determines the extent to which Hostetter's debt to MBNA is excepted from discharge under 11 U.S.C. § 523(a)(2)(A), but this is not a monetary judgment of this Court. MBNA is free to pursue collection of its nondischargeable debt in a court other than this one.