**In re James Edward LUEDTKE, Debtor.**

**Falk Engineering & Surveying, Inc., Plaintiff,**

**v.**

**James Edward Luedtke, Defendant.**

**Bankruptcy No. 08–21611. Adversary No. 08–2099.**

United States Bankruptcy Court, N.D. Indiana, Hammond Division.

April 2, 2010.

Carina M. De la Torre, Esq., Indianapolis, IN, for the Plaintiff.

Lori D. Fisher, Esq., Merrillville, IN, for the Defendant, James Edward Luedtke.

### DECISION ON THE APPLICATION OF COLLATERAL ESTOPPEL

**J. PHILIP KLINGEBERGER,**
Bankruptcy Judge.

This matter comes before the Court on the Plaintiff's, Falk Engineering & Surveying, Inc.'s ("Falk"), complaint to determine the dischargeability of debt filed against the debtor, James Edward Luedtke ("Luedtke"). In its complaint, Falk asserts that Luedtke's debt to it should be excepted from discharge pursuant to 11 U.S.C. § 523(a), particularly § 523(a)(2)(A) and § 523(a)(4). Falk contends that the exception from discharge allegations pled in the foregoing complaint are subject to the doctrine of collateral estoppel, due to the fact that a civil judgement was entered in the Porter County

Superior Court on May 2, 2007, in the case of *Falk Surveying & Engineering, Inc v. Theresa Luedtke, et al.,* under Cause No. 64D02–0306–CT–4819, which found James Luedtke liable for criminal receipt of stolen property pursuant to Indiana Code § 35–43–4–2(b).

Therefore, the issue in this case is whether the elements of Luedtke's liability, as established by the state court, satisfy the "actual fraud" elements of § 523(a)(2)(A) and/or the "larceny" prong of 11 U.S.C. § 523(a)(4).[1] This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a), and N.D.Ind.L.R. 200.1(a)(2). This matter constitutes a "core" proceeding as defined by 28 U.S.C. § 157(b)(2)(I).[2]

### I. *Statement of the Record*

This adversary proceeding was initiated by a complaint filed on September 15, 2008. Luedtke filed an answer to the complaint on September 23, 2008, denying the substantive allegations thereof. A preliminary pre-trial conference was held on October 22, 2008, and the court entered an order on November 4, 2008, regarding Falk's contention that collateral estoppel applied, and ordered Falk to file of record exemplified copies of the following documents filed in the state court proceeding:

- all pleadings;
- the final pre-trial order;
- the instructions given to the jury;
- the jury's verdict;
- any judgment entered by the trial court following the conclusion of trial; and
- any interlocutory orders resolving any case issues prior to trial.

---

1. Luedtke's liability was determined by a jury.

2. If Falk is unsuccessful at this point, this case will proceed on the complaint. This decision only relates to whether Falk has es-
tablished the exception form discharge standards under federal law, as a matter of law, by operation of the state court determination.

On December 10, 2008, Falk filed exemplified copies of the foregoing documents with the court.[3] On February 11, 2008, a pre-trial conference was held at which the parties agreed that the collateral estoppel issues could be determined on the basis of the record of those proceedings filed with the court on December 10, 2008.[4] These documents constitute the entire record upon which this court will base its ruling as to the collateral estoppel issues and is comprised of the following:

Certification from the Porter County Superior Court

Complaint and Jury Demand filed by Falk

First Amended Complaint and Jury Demand filed by Falk

Answer filed by Luedtke[5]

Answer to Counter–Claim filed by Falk

Order on Plaintiff's Motion for Partial Dismissal[6]

Order of Default Judgment[7]

Order filed on January 28, 2004 (stipulation to dismiss)[8]

Pre–Trial Order filed on February 20, 2007[9]

Pre–Trial Conference Order[10]

Order (of dismissal) entered on March 19, 2007[11]

Jury Trial Minutes

Court's Preliminary Instruction 1.05, et al. (filed on March 19, 2007)[12]

Order on Motions in Limine and other Pre–Trial Matters[13]

---

3. *See*, Docket Entry # 14. Also, on December 23, 2010, Falk filed a document entitled, Statement Regarding State Court Litigation. This appears to be a narrative summary of the documents previously filed on December 10, 2008.

4. *See*, Order Concerning Determination of Case on a Stipulated Record entered on March 3, 2009. (Docket Entry # 20).

5. In the Answer, Theresa Luedtke pled a counter-claim against Falk alleging unpaid wages.

6. The order was entered on March 4, 2004, and is directed to the defendants Patti Patane and Frances McCormick.

7. This order was entered on November 26, 2003, and is directed to the defendants James T. Marlor and Frank Marlor.

8. This order dismissed the claims against Jonathon Luedtke with prejudice.

9. The order was filed on February 20, 2007 and was signed by the presiding judge, but it is unclear when it was entered.

10. This order, entered on February 20, 2007, confirmed the trial date, set a hearing for the defendants motion to add affirmative defenses/non-parties, partially granted Falk's motion in limine, and set the remaining evidentiary issues for hearing.

11. The order dismissed all remaining defendants from the lawsuit, except, Theresa M. Luedtke and James Luedtke.

12. This grouping seems to include six other preliminary instructions issued by the court which were filed on this day as well, along with five other instructions entitled, Defendant's Instruction No. 8, Defendant's Instruction No. 9, Defendant's Instruction No. 10, Defendant's Instruction No. 11, and Defendant's Instruction No. (sic). Unfortunately, the manner in which these documents were filed is somewhat confusing. All of the documents comprising the record in the state court were filed as attachments to Docket Entry # 14, but were arbitrarily grouped together as "exhibits". For instance, the foregoing instructions were filed as Exhibit E, but so was the Pre–Trial Order and the Pre–Trial Conference Order. While in Exhibit F, the first document is entitled, Court's Preliminary Jury Instruction Number 1.10 after that is Court's Preliminary Jury Instruction Number 1.01 and after that are the Defendant's Instructions referenced above, all of which the court presumes to be a part of the March 19th filing.

13. This order, filed on March 19, 2007, is unclear as to when it was actually entered by

Jury Trial Minutes filed on March 20, 2007

Court's Final Jury Instruction Number 3.13, et al.[14]

Jury Trial Minutes filed on March 21, 2007

Verdict Form B

Verdict Form C

Order on Treble Damages entered on May 2, 2007

Order entered on June 18, 2007 [15]

Order on Treble Damages entered on May 2, 2007.[16]

Amended Order on Treble Damages entered on May 2, 2007.[17]

Judgement Docket

The parties filed legal memoranda as directed by the court. This case is now before the Court to enter a decision, based upon the state court record, as to whether collateral estoppel effect should be given to the judgment rendered in the Porter County Superior Court, and whether as a result the debt owed to Falk by Luedtke is excepted from discharge under 11 U.S.C. § 523(a)(2)(A) and/or § 523(a)(4).

## II. *Statement of the State Court Proceedings*

On June 5, 2003, Falk filed a Complaint and Jury Demand in the Porter County Superior Court under Cause No. 64D02–0306–CT–4819 against the following individuals: Theresa Luedtke, James Luedtke, Sabrina Luedtke, James Marlor, Patti Patane, Erin Essex, Frances McCormick and Jonathon Luedtke. On June 26, 2003, Falk filed an amended complaint naming the same defendants and adding Frank Marlor as an additional defendant. In its amended complaint Falk pled the following as to the several defendants:

Count I Actual Fraud (Theresa Luedtke, James Luedtke and Sabrina Luedtke)

Count II Constructive Fraud (Theresa Luedtke)

Count III Negligence (Theresa Luedtke)

Count IV Breach of Fiduciary Duty (Theresa Luedtke)

Count V Theft [18] (Theresa Luedtke and Sabrina Luedtke)

Count VI Criminal Conversion [19] (All Defendants)

Count VII Civil Conversion (All Defendants)

Count VIII Theft/Receiving Stolen Property [20] (All Defendants, except Theresa Luedtke)

Count IX Money Laundering (All Defendants)

Count X Unjust Enrichment (All Defendants)

Count XI Constructive Trust (All Defendants)

the court. It addresses certain evidentiary issues irrelevant to this decision.

14. These are sixteen separate instructions apparently filed on March 21, 2007: Courts Final Jury Instruction Number 3.13, 1.17, 1.03, 7.05, 9.01, 4.02, 1.09, 114.10, 114.06, 114.08, 114.07, 114.09, 114.04, 114.05, 3.17 and 3.19.

15. This order corrected a scrivener's error *nunc pro tunc*, in the May 2, 2007 Order on Treble Damages.

16. This order was filed on June 18, 2007 and apparently is the result of the order correcting the scrivener's error.

17. This order was filed on June 19, 2007 and appears to be a duplicate of the order filed on June 18, 2007, except that it connotes that it is an "amended" order.

18. *See*, I.C. § 35–43–4–2

19. *See*, I.C. § 35–43–4–3

20. *See*, I.C. § 35–43–4–2

Count XII Treble Damages [21] (All Defendants)

Count XIII Punitive Damages (All Defendants)

Count XIV Accounting (All Defendants)

The amended complaint alleges that on June 24,1998, Falk, an Indiana corporation, hired Theresa Luedtke as a bookkeeper and office manager. During the course of her employment, many additional administrative tasks were turned over to her including responsibility for managing the accounts payable, accounts receivable, and the payroll. Falk alleged that during her employment, Theresa Luedtke criminally converted the funds in Falk's corporate checking account by authorizing a wire transfer in the amount of $2,507.31 to another bank and by purchasing various items for herself and the other named defendants.[22] These items were alleged to include a Saturn sedan, a Jeep Cherokee, a Ford Bronco, a Chevrolet Cavalier, a condominium in the state of Hawaii, furniture and new computers. It was also alleged that she paid a vendor to perform certain computer tasks at her private residence, paid vendors and contractors to complete home improvement tasks both at her private residence and on a rental residence she was purchasing, and made mortgage payments on the home of another Falk employee. It was also alleged that Theresa Luedtke misused Falk's Federal Express account, its Staples account and its American Express credit card to purchase gifts, including plane tickets, for various friends and family members. Theresa Luedtke also allegedly loaned money to various individuals through the company's corporate account and personally accepted repayment of the loans, all the while not paying the corporation's payroll taxes. Finally, it was alleged that she established a "ghost payroll" for her 21-year old stepdaughter and caused Falk to remit health insurance premiums on her daughter's behalf. It was asserted that Theresa Luedtke was also making false entries Falk's financial records and books while this theft was going on.[23]

On July 28, 2008, Theresa Luedtke, James Luedtke, Sabrina Luedtke, Katrina Luedtke and Jonathon Luedtke filed an answer to the amended complaint. James Luedtke denied the substantive allegations levied against him contained in Counts I, and VI through XIV of the amended complaint. Following other procedural matters not relevant here, a final pre-trial order was entered by the state court in which Falk made the following contentions as to James and Theresa Luedtke:

Luedtke abused her responsibility and her access to information, and committed theft, conversion, fraud, breached her fiduciary duties, and committed other intentional criminal and civil violations and acts. James Luedtke also participated in, conspired in, and benefitted from the theft, conversion and criminal and civil violations and acts committed by Theresa and James Luedtke (hereinafter "The Luedtkes"). Plaintiff also contends that the other named defendants received stolen and misappropriated property, monies, equipment, and other benefits which receipt and, in some cases, continued possession, is wrongful and in violation of the law, and that a constructive trust should be ap-

21. *See,* I.C. § 34–24–3–1

22. Though not specifically stated in the complaint, the court concludes that Theresa Luedtke was employed at least through 2002 and that these activities were ongoing.

23. At some time prior to the trial in this case, as a result of the foregoing conduct Theresa Luedtke pled guilty in the criminal court to the charge of theft as a Class C felony.

plied to all property held by these defendants.

* * *

In the Jury Trial Minutes entered by the court on March 19, 2007, the court indicated that it gave the following instructions to the jury: Indiana Pattern Nos. 1.01, 1.03, 1.05, 1.09, 1.10, 1.11, 1.12, 1.13 and 1.15. However, these instructions were more or less preliminary in nature and did not address the elements of the causes of action being alleged against the Debtor. Subsequently, at the close of Falk's case on March 21, 2007, the court entered another set of Jury Trial Minutes which indicated that the defendants presented no witnesses and rested. It also provided in pertinent part:

> The Court finds that on the Plaintiff's Complaint, Counts I, II, III and IV were dismissed by the Plaintiff. The Court entered a directed verdict on Count V. Count VI was dismissed by the Court over the Plaintiff's objection, Count VII was dismissed by the Plaintiff, Count VIII remains for jury verdict, Count IX was dismissed by the Plaintiff, Counts X, XI, and XII are to be ruled by the Court and Counts XIII & XIV were dismissed by the Plaintiff.

> Closing arguments are presented to the jury by the parties.

> The court reads the final instructions to the jury, to-wit: Indiana Pattern Instruction Nos. 3.13, 1.17, 1.03, 7.05, 9.01, 4.02, 1.09, 114.10, 114.06, 114.08, 114.07, 114.09, 114.04, 114.05, 3.17 and 3.19.

* * *

The only count that remained for jury deliberation on as to James Luedtke was Count VIII, for Criminal Intentional Receipt of Stolen Property. Out of the several instructions the court gave the jury,

the following are relevant to the action against James Luedtke:

> *Court's Preliminary Instruction No. 1.03*
> Issues for Trial—Parties' Burdens
> ..."The Plaintiff also claims that Defendant James Luedtke committed intentional acts and the crimes of Theft, Conversion, and/or Receiving Stolen Property, and further claims that Defendant James Luedtke received, retained, and/or disposed of Plaintiff's stolen property."...

> *Court's Final Jury Instruction number 7.05*
> "The burden is on the plaintiff in a civil action such as this, to prove the elements of his claim by a preponderance of the evidence."

> *Court's Final Jury Instruction Number 114.06*
> Under Indiana law, a person who knowingly or intentionally receives, retains or disposes of the property of another person that has been the subject of theft commits the crime of receiving stolen property.

> *Court's Final Jury Instruction Number 114.08*
> Intentionally is defined by statute as follows: a person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscience (sic) objective to do so. Knowingly is defined by statute as follows: a person engages in conduct 'knowingly' if, when he engages in conduct he is aware of a high probability that he is doing so.

> *Court's Final Jury Instruction Number 114.07*
> In the context of the crime of receiving stolen property, the test of knowledge is a subjective one, asking whether the defendant knows from the circumstances surrounding the possession that the property had been the subject of a theft.

Ultimately the jury returned a verdict on Count VIII in favor of Falk and against James Luedtke: "We the jury find in favor of the plaintiff, Falk PLI Engineering & Surveying, Inc., and against the defendant, James Luedtke, in the amount of $386,081.00." [24]

On May 2, 2007, the trial court entered an Order on Treble Damages, which provided as follows:

This cause was tried to a jury on March 21, 2007, the jury found for the Plaintiff and against the defendant, Theresa M. Luedtke, in the amount of $1,268,673.25; and, against the defendant, James Luedtke, in the amount of $368,081.00. The jury awards were in gross and the Court is unable to determine the amount of money belonging to the Plaintiff and converted by defendant, Theresa M. Luedtke, from the verdict entry. However, defendant, James Luedtke, was found by the jury to have knowingly or intentionally received, retained, or disposed of money which was the subject of theft in the amount of $368,081.00, which amount was shown on Plaintiff's Exhibit Number 15.

Therefore, for purposes of I.C. 34–24–3–1 and for restitution purposes, in determining the "*actual damages of the person suffering the loss*", the Court will use the $368,081.00 amount as to defendant Theresa M. Luedtke. The total sum total amount against Theresa M. Luedtke shall be:

| | | |
|---|---|---|
| 1. | Restitution and base judgment amount | $ 368,081.00 |
| 2. | Trebled amount of judgment ($368,081.00 × 3) | = $1,104,243.00 |
| 3. | Judgment remainder ($1,268,673.25–$368,081.00) | = $ 900,592.25 |
| 4. | Attorney Fees | $ 80,678.75 |
| 5. | Litigation costs | $ 1,080.85 |

**TOTAL AMOUNT AGAINST THERESA M. Luedtke** = $2,454,675.85

I.C. 34–24–3–1 provides in part, ". . . [T] the person may bring a civil action against *the person who caused the loss* for the following:" (emphasis added) James Luedtke did not cause the loss to the Plaintiff, Theresa M. Luedtke caused that loss. He did, however, receive a financial benefit as a result of Theresa M. Luedtke's theft.

It is apparent that the jury determined the damages attributable to James Luedtke from Plaintiff's Exhibit Number 15 and that amount showed no credit for funds recovered by the Plaintiff. As a result, the final judgment against defendant James Luedtke should be computed as follows:

| | | |
|---|---|---|
| 1. | Amount awarded to Plaintiff by the Jury | = $368,081.00 |
| 2. | Less the amount recovered from Plaintiff's theft policy | $ 55,000.00 |
| 3. | Less the amount recovered from Jeff Nix | = $ 10,500.00 |
| | TOTAL AMOUNT AGAINST JAMES Luedtke | = $302,581.00 |

A **joint and several judgment** should be, and it hereby is, entered in favor of Plaintiff and **against James Luedtke and Theresa M. Luedtke, husband and wife, in the amount of $302,581.00;** and, judgment should be entered in favor of Plaintiff and **against Theresa M. Luedtke, individually, in the amount of ($2,454,675.85–$302,581.00) = $2,152,094.85.** [25]

The foregoing order was signed by Judge William E. Alexa of the Porter County Superior and directly to the left of his signature is the following hand-written statement: "This order and judgement supercedes and replaces the judgment on the original jury verdict entered on 3/21/07." Subsequently, on June 18, 2007, the court entered an order regarding a scrivener's

24. *See,* Jury Trial Minutes which were entered on March 21, 2007.

25. This court did not add or supply the emphasis contained in the foregoing order.

error in the May 2, 2007 Order on Treble Damages—the court apparently had transposed two numbers in the jury's damage award against James Luedtke. On June 18, 2007, a second order titled Order on Treble Damages was filed in court, but still reflected the May 2nd entry date. Then, on June 19, 2007 a third order entitled, "Amended Order on Treble Damages" was filed in court; again the order indicates that it was entered on May 2, 2007. However, this order as well as the previous one did not contain a statement, hand written or otherwise, which indicated that it superceded and replaced the judgment on the original jury verdict. But, it is obvious that this was the intent, due to the fact that the Amended Order on Treble Damages substantially increases the judgment against Theresa Luedtke to the amount of $2,508,675.85 and modestly decreases the judgement against the debtor to the amount $320,581.00.

### III. ANALYSIS

■ The issues in this case are whether under the doctrine of collateral estoppel, the elements of Luedtke's liability, as established by the state court, satisfy the "actual fraud" elements of § 523(a)(2)(A) or the "larceny" prong of 11 U.S.C. § 523(a)(4). It is undisputed that collateral estoppel (also known as issue preclusion) applies in the bankruptcy context; *In re Jones*, 180 B.R. 531, 532 (S.D.Ind.1994) citing *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 658, n. 11, 112 L.E.2d 755 (1991). A state court judgment is entitled to full faith and credit in bankruptcy proceedings; 28 U.S.C. § 1738 (West 2006); *Matter of Bulic*, 997 F.2d 299, 304 (7th Cir.1993). The effect of a judgment in subsequent litigation is determined by the law of the jurisdiction that rendered the judgment; *In re Catt*, 368 F.3d 789, 790–91 (7th Cir.2004); *Wolverine Mutual Insurance v. Vance*, 325 F.3d 939

(7th Cir.2003); *In re Scarborough*, 171 F.3d 638 (8th Cir.1999) *cert. denied* 528 U.S. 931, 120 S.Ct. 330, 145 L.Ed.2d 258 (1999); *In re Keaty*, 397 F.3d 264, 270 (5th Cir.2005) (discussing the requirement of "actually litigated"); *Brokaw v. Weaver*, 305 F.3d 660, 669 (7th Cir.2002) ["The preclusive effect of a state court judgment in a federal case is a matter of state rather than of federal law"]. Therefore, the effect of the Porter Superior Court's judgment for collateral estoppel purposes is governed by Indiana law.

■ Collateral estoppel bars the relitigation of issues or claims that have been previously litigated. Under federal law, collateral estoppel applies if the following factors can be satisfactorily established: (1) the issue sought to be precluded is the same as that involved in a prior action, (2) the issue was actually litigated, (3) determination of the issue was essential to the final judgment, and (4) the party to be estopped was fully represented in the prior action. *Levinson v. United States*, 969 F.2d 260, 264 (7th Cir.1992) (citing *Klingman v. Levinson*, 831 F.2d 1292, 1295 (7th Cir.1987); *In re Massey*, 228 B.R. 686, 690 (Bankr.S.D.Ind.1998); *In re Busick*, 264 B.R. 518, 522 (Bankr.N.D.Ind.2001); *In re Staggs*, 177 B.R. 92, 95 (N.D.Ind.1995); *In re Lehman's Inc. of Anderson*, 163 B.R. 814, 816 (S.D.Ind.1994)). Under Indiana law, the same elements for collateral estoppel apply. *In re Jones*, 180 B.R. 531, 533 n. 3 (S.D.Ind.1994); see also *Millenium Club, Inc. v. Avila*, 809 N.E.2d 906 (Ind.Ct.App.2004) citing *Pritchett v. Heil*, 756 N.E.2d 561 (Ind.Ct.App.2001); *Infectious Disease of Indianapolis, P.S.C. v. Toney*, 813 N.E.2d 1223, (Ind.Ct.App. 2004); *Tofany v. NBS Imaging Systems, Inc.*, 616 N.E.2d 1034 (Ind.1993). As stated in *Segovia v. State of Indiana*, 666 N.E.2d 105, 107 (Ind.App.1996):

In order to apply the doctrine of collateral estoppel, the court must engage in a two step analysis: "(1) determine what the first judgment decided; and (2) examine how that determination bears on the second case." *Webb v. State*, 453 N.E.2d 180, 183 (Ind.1983), *reh. denied*, *cert. denied*, 465 U.S. 1081, 104 S.Ct. 1449, 79 L.Ed.2d 767 (1984) (citing *United States v. Mespoulede*, 597 F.2d 329 (2d Cir.1979)).

In addition, in the situation in which a different *claim* is asserted in a subsequent lawsuit, collateral estoppel will still apply if an issue of fact material to both actions was determined in the prior case. This is relevant in the matter before the court as the Debtor in the state court was found liable for Criminal Intentional Receipt of Stolen Property pursuant to Indiana Code § 35–43–4–2(b), and now a different claim is being brought against him in the bankruptcy court, one for dischargeability. As stated in *In re Staggs*, 178 B.R. 767, 773 (Bankr.N.D.Ind.1994) [citing the Restatement (Second) of Judgments]:

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim ... A review of Indiana case law shows that this general rule is followed by the Indiana courts as well. *Bulic*, 997 F.2d at 304 n. 6) (quoting *Bicknell*, 118 B.R. at 664 (citing *Hardesty v. Bolerjack*, 441 N.E.2d 243, 245 (Ind.App.1982)).

In determining whether or not collateral estoppel applies in a subsequent proceeding, the court must examine the entire record before the court which entered the prior decision. As stated in *Segovia, supra.*, 666 N.E.2d at 107:

> [Determining] what the first judgment decided involves an examination of the record of the prior proceedings including the pleadings, evidence, charge and any other relevant matters. 453 N.E.2d at 184. The court must then decide whether a reasonable jury could have based its verdict upon any factor other than the factor of which the defendant seeks to foreclose consideration. *Id.* If the jury could have based its decision on another factor, then collateral estoppel does not bar relitigation. *Id.*

Because the Porter County Superior Court pursuant to a jury verdict entered a judgment against Luedtke for the receipt of stolen property, this Court must now determine whether or not the issues decided rise to the level required for the debt to be excepted from discharge pursuant to 11 U.S.C. § 523(a)(4) or 11 U.S.C. § 523(a)(2)(A).

In an adversary proceeding to determine the non-dischargeability of a debt, the burden of proof is on the plaintiff as to each element of the statutory exception to discharge. *In re Kreps*, 700 F.2d 372, 376 (7th Cir.1983); *Zygulski v. Daugherty*, 236 B.R. 646, 653 (N.D.Ind. 1999), *citing*, *Matter of Scarlata*, 979 F.2d 521, 524 (7th Cir.1992). Furthermore, exceptions to discharge are to be construed strictly against the creditor and liberally in favor of the debtor. *Matter of Scarlata*, 979 F.2d at 524 (*citing*, *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir.1985)). The statute is to be narrowly construed so as not to undermine the Bankruptcy Code's purpose of giving the honest but unfortunate debtor a fresh start. *Park National Bank & Trust of Chicago v. Paul*, 266 B.R. 686, 693 (Bankr.N.D.Ill.2001). The United States Supreme Court has held that the standard of proof in non-dischargeability proceedings under § 523(a) is a preponderance of evidence standard rather than

252

the more stringent standard of clear and convincing evidence; *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

 Falk first contends that Criminal Intentional Receipt of Stolen Goods under I.C. § 35–43–4–2(b) meets the elements of "larceny" under 11 U.S.C. § 523(a)(4). 11 U.S.C. § 523(a)(4) provides that a debt is excepted from discharge if the debt is "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."[26] For the purpose of determining dischargeability, embezzlement and larceny are defined by federal common law; *Doran Services v. Valentine*, 104 B.R. 67, 70 (Bankr.S.D.Ind. 1988). According to the Seventh Circuit Court of Appeals, larceny is proven under § 523(a)(4) if it is shown that the debtor wrongfully and with fraudulent intent took property from its owner; *In the Matter of Rose*, 934 F.2d 901, 902 (7th Cir.1991) (citing, *In re Nahabedian*, 87 B.R. 214, 215 (Bkrtcy.S.D.Fla.1998); *In re Hoffman*, 70 B.R. 155, 161 (Bkrtcy.W.D.Ar.1986)). Bankruptcy courts have taken the position that larceny requires felonious intent to exist at the time of the taking; *In re Brown*, 2009 WL 2461241, *6 (Bankr. N.D.Ill.2009) (citing, Black's Law Dictionary (6th ed.1990); *United States Life Title Ins. Co. v. Dohm*, 19 B.R. 134 (N.D.Ill. 1982); 4 Collier, ¶ 523.10[2] ); *In re Hoffman*, 70 B.R. 155, 161 (Bankr.W.D.Ark. 1986) (citing, 3 *Collier on Bankruptcy*, ¶ 523.14[3] (15th ed.1981)). Thus, to constitute larceny, the original taking must be unlawful; *Bombardier Capital, Inc. v. Do-*

*bek*, 278 B.R. 496, 509–10 (Bankr.N.D.Ill. 2002) (citing, *Pierce v. Pyritz*, 200 B.R. 203, 205 (N.D.Ill.1996)).[27]

Falk's position is that the elements of the offense of Criminal Intentional Receipt of Stolen Goods under Indiana Code § 35–43–4–2(b) parallel the federal common law elements of larceny, and that because Luedtke was found liable for this offense in state court then *ipso facto* the elements of larceny under § 523(a)(4) have been satisfied. Luedtke takes the position that the federal definition of larceny requires that the debtor must do the original taking, and that the state court determined only that Luedtke received the "fruits" of the act, as the Amended Order on Treble Damages states: "[D]efendant, James Luedtke, was found by the jury to have knowingly or intentionally received, retained, or disposed of money which was the subject of theft in the amount of $368,081.00, which amount was shown on Plaintiff's Exhibit Number 15." This order also stated in pertinent part: "James Luedtke did not cause the loss to the Plaintiff, Theresa M. Luedtke caused that loss. He did, however, receive a financial benefit as a result of Theresa M. Luedtke's theft."

In response to the Debtor's argument that Luedtke's acts do not fit within the federal definition of larceny, Falk urges this court to adopt a broader definition of larceny. In support of its position, Falk cites the case of *United States Fire Ins. Co. v. Harris*, 952 F.2d 1396 (4th Cir.1992), in which the bankruptcy court reasoned

---

**26.** It is the *entire* debt, including treble damages and attorneys' fees, that is excepted from discharge, if state law provides for consequential damages with respect to conduct which meets the exception to discharge standards of 11 U.S.C. § 523(a); *Cohen v. de la Cruz*, 523 U.S. 213, 220, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998).

**27.** Embezzlement differs from larceny only in that in embezzlement, the original exercise of control over property was lawful, i.e. the property came into the hands of the debtor lawfully, as by consent; *In re Rose*, 934 F.2d 901, 903 (7th Cir.1991).

that because under Virginia law the offense of receipt of stolen property is included as larceny, then a debt arising out the receipt of stolen property is nondischargeable under 11 U.S.C. § 523(a)(4) as larceny. Falk compares this case to *Muse v. State*, 419 N.E.2d 1302, 1303 (Ind.1981), where the Indiana Supreme Court held that "knowing receipt of stolen property" is a type of "larceny".

But, as Luedtke points out, after *Muse* the Indiana theft statute was amended to distinguish between two offenses. The statute under which Luedtke was found liable is section (b) of I.C. § 35–43–4–2, which is entitled "Theft; receiving stolen property". The entire statute provides as follows:

> (a) A person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft, a Class D felony. However, the offense is a Class C felony if the fair market value of the property is at least one hundred thousand dollars ($100,000).
>
> (b) A person who knowingly or intentionally receives, retains, or disposes of the property of another person that has been the subject of a theft commits receiving stolen property, a Class D felony. However, the offense is a Class C felony if the fair market value of the property is at least one hundred thousand dollars ($100,000).

Section (a) of the foregoing statute provides the elements necessary to prove garden variety theft, while section (b) is the offense for which Luedtke was found liable. Falk expansively discusses the evolution of the theft statute in Indiana, including *Gibson v. State*, 643 N.E.2d 885 (Ind. 1994) in which the Indiana Supreme Court held "that the accused, whether actual thief or not, has done precisely what is forbidden by both subsection (a) and (b)— knowingly or intentionally exercising unlawful control over property of another."

It is true that under either offense, the perpetrator has knowingly or intentionally exercised unlawful control over the property of another. But the fact remains that these are two **separate** offenses under Indiana law. Falk does not cite any case decided by the Seventh Circuit Court of Appeals or an Indiana appellate court which holds that the offenses of theft and of receiving stolen property are somehow collapsed into one single offense under this statute. In the case which Falk cites in support of its position that theft and receipt of stolen property is/are the same offense, the Indiana Supreme Court specifically held that these are in fact two different offenses; *See, Gibson v. State*, 643 N.E.2d 885, 892 (Ind.1994) (*held*, "We recognize that in providing the State the flexibility to proceed under either subsection of Indiana Code § 35–43–4–2, the potential for multiple prosecutions arises. Therefore, we further hold that a person may not be convicted of both Theft and Receiving Stolen Property with regard to property appropriated in the same transaction or series of transactions.").

The Seventh Circuit's definition of larceny for dischargeability purposes is narrower than *either* offense described in I.C. § 35–43–4–2. Under the Seventh Circuit's requirements it must be shown that the debtor, wrongfully and with fraudulent intent, took property from its owner. The taking must be a direct action taken by the debtor *vis-a-vis* the owner. The focus is the actual theft itself as contrasted to the receipt of the property from another party after the act is done. The fact that bankruptcy courts have held that felonious intent must exist at the time of the taking only bolsters the conclusion that in order for there to be federal common law larce-

ny, the debtor must have been an active participant in the theft. This interpretation is in accord with the general concept that exceptions to dischargeability are to be narrowly construed.[28] Simply put, the record in the state court record does not support a finding that the issue of federal common law larceny under 11 U.S.C. § 523(a)(4) was decided in the state court. To the contrary, the Amended Order on Treble Damages specifically finds that Luedtke did not cause Falk's loss—his wife was the direct wrongdoer.

 Additionally, the jury found that Luedtke either "knowingly" or "intentionally" received the proceeds of a theft. Pursuant to the instruction submitted to the jury:

> Intentionally is defined by statute as follows: a person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscience (sic) objective to do so. Knowingly is defined by statute as follows: a person engages in conduct 'knowingly' if, when he engages in conduct he is aware of a high probability that he is doing so.

So Luedtke either received the proceeds of his wife's theft with a conscious objective to do so—perhaps as part of a fraudulent scheme—or he did it knowing that there was a high probability that he was receiving stolen property. This is the intent necessary to conclude that one engaged in the act of receiving stolen property, and this is what was litigated and decided by a jury in the Porter County Superior Court. This is a world apart from the federal common law definition of larceny which requires a finding by the trier of fact that the debtor *wrongfully* and with *fraudulent intent* **took property from its owner.** Without question this issue was not decided in the state court as to James Luedtke.

Even assuming that this court were to find that the acts of Luedtke fit within the federal common law definition of "larceny", there is another problem with Falk's argument that pursuant to the state court record, collateral estoppel applies as to the elements of § 523(a)(4). Under § 523(a)(4) there must be an intent to defraud on the part of the debtor. The state court found that Luedtke, "was found by the jury to have knowingly or intentionally received, retained, or disposed of money which was the subject of theft in the amount of $368,081.00 ..." Falk argues that although it is unclear whether the act was done intentionally or knowingly, the fact remains that Luedtke still possessed the requisite intent, or *mens rea,* to commit the act. But, this position mistakes the intent to commit the act under state law, with the fact that § 523(a)(4) requires fraudulent intent on the part of the actor.

Falk argues that there are many examples in the dischargeability context in which it has been found that an act was committed "knowingly", and as a result the court found that the conduct of the debtor rose to the level of fraudulent intent. However, in many of the cases to which Falk refers, and in the cases of the Seventh Circuit, although the act may have been committed "knowingly", it was still necessary for the court to examine whether the facts of the case indicated fraud. In the case of, *In the Matter of Rose,* 934 F.2d 901, 902 (7th Cir.1991), it was stated:

> Plaintiff Elliott Kaye initiated an adversary proceeding in bankruptcy court against debtor Dawn Rose, who is his former wife, and her interim bankruptcy trustee, Allan J. Demars, to determine the dischargeability of a debt. Kaye's second amended complaint alleged that

---

**28.** As will be discussed *infra* in the context of "actual fraud" under § 523(a)(2)(A), this con-

cept was tapered a bit in the case of *McClellan v. Cantrell,* 217 F.3d 890 (7th Cir.2000).

Kaye and Rose traveled to Australia in November 1982, when they were still married, bringing with them $184,000 in cash and traveler's checks belonging to Kaye. The couple deposited the sum in a safety deposit box to which both Rose and Kaye were signatories. Rose left Australia abruptly two months after their arrival, and Kaye alleged that Rose had taken $93,000 of his funds with her. She had mailed $80,000 to herself via a then friend in California and took the rest with her. In December 1982 Rose instituted divorce proceedings in the Circuit Court of Cook County, Illinois, where Judge Willard J. Lassers entered judgment in favor of Kaye and against Rose for $93,000 because of her "larcenous removal of said funds from Australia." Instead of returning Kaye's funds as ordered, Rose filed for bankruptcy. Kaye sought a determination from the bankruptcy court that the $93,000 debt was nondischargeable pursuant to 11 U.S.C. § 523(a)(4) because it had been incurred through larceny. Bankruptcy Judge Katz entered judgment after a two-day trial denying Rose a discharge from the $93,000 debt. The case was appealed to District Judge Ann C. Williams, who agreed with the bankruptcy court, and subsequently Rose appealed to the [Seventh Circuit Court of Appeals].

The court upheld both the decisions of the bankruptcy and district courts, and as to the issue of fraudulent intent the court stated:

Rose also cites *Rauch* for the proposition that any inference of fraud must be unequivocal. *Rauch*, 18 Bankr.at 99. In this case, the bankruptcy judge in-

ferred from Rose's furtive mailings to California and from her knowledge that Kaye had no intention of sharing his funds with her that Rose had acted with fraudulent intent. **Intent may properly be inferred from the totality of the circumstances and the conduct of the person accused.** *Nahabedian*, 87 B.R. at 216. *Rauch* is simply a case in which plaintiff failed to introduce any evidence from which an inference of fraud could be drawn.

*Id.* at 904. (Emphasis added)

In order to put the foregoing concept into context it would be helpful to examine this court's unpublished decision in the case of *Davis v. Karner*, Adversary No. 05–6108. In that case the plaintiff, Fred Davis, authorized the debtor, Anna Ruth Davis Karner, to draw on his checking account with the understanding that she would have the limited authority to pay for his burial expenses and/or the general directing of funds at his request. Davis discovered that Karner had withdrawn $19,900.00 from the account for uses other than at Davis' direction. Davis sued Karner in state court and obtained a judgment for conversion under I.C. § 35–43–4–3.[29] Subsequently, after Karner filed bankruptcy, Davis brought a dischargeability action under 11 U.S.C. § 523(a)(4) and argued that the doctrine of collateral estoppel applied. This court analyzed the issues as follows:

The element of fraudulent intent is a constant in federal decisions under § 523(a)(4)'s "embezzlement" and "larceny" prongs; *See*, e.g., *In re Dempster*, 182 B.R. 790, 802 (Bankr.N.D.Ill.1995);

---

**29.** This offense differs from theft under I.C. § 35–43–4–2(a) in that all that is required is a showing that the offender exercised unauthorized control over the property, whereas the theft statute has an additional element requir-

ing that, besides the unauthorized control, the offender also had the intent to deprive the other person of the value or use of the property.

*In re Fields*, 2005 WL 2205787 (Bankr. C.D.Ill.2005); *In re Brady*, 101 F.3d 1165, 1172–3 (6th Cir.1996); *In re Rogstad*, 126 F.3d 1224, 1228 (9th Cir.1997); *In re Fuget*, 339 B.R. 702, 707 (Bankr. S.D.Iowa 2006); *In re Lammers*, 2005 WL 1498336 (Bankr.M.D.Fla.2005).

In order to sustain an action for "embezzlement" or "larceny" under 11 U.S.C. § 523(a)(4), the plaintiff must establish not only that the debtor exercised unauthorized control over property, but that the debtor had a fraudulent intent in doing so. Under this framework, the Lake Superior Court, in its judgment, found as follows:

1. The Court finds that Anna Davis Karner removed from account # 000185 050 243 111 twelve separate withdrawals as more particularly described in Request for Admissions 1 thru 11 in a total sum of $19,900.00 from January 3, 2000, through August 8, 2000, and repaid the sum of $1,000.00 on April 26, 2000.

2. The Court further finds the money withdrawn was the sole property of Fred Davis and the withdrawals by Anna Davis Karner were without the knowledge, consent or authority of Fred Davis and contrary to the specific grant of authorization, to Anna Davis Karner, which was to make withdrawals only for the benefit of Fred Davis.

4. The Court further finds that the action, of Anna Davis Karner, in withdrawing the funds of Fred Davis, constitute conversion entitling Fred Davis to an amount not to exceed 3 times the actual damages plus attorneys fees pursuant to I.C. 34–24–3–1. The Court finds that the "punitive" or "treble" damages in this case should be three times [sic] the actual damages of $18,900.00 or $56,700.00.

*See,* State Court Order (¶ s 1, 2 & 4)

The place to start is to analyze the elements for conversion, the tort for which the Defendant was found liable, under state law. Indiana Code 35–43–4–3 provides in pertinent part:

a) A person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion, a Class A misdemeanor.

 *See,* Indiana Code 35–43–4–3(a) (West 2006).

Indiana Code 35–43–4–1 defines the "exertion of control over property" and "unauthorized" as follows:

(a) As used in this chapter, "exert control over property" means to obtain, take, carry, drive, lead away, conceal, abandon, sell, convey, encumber, or possess property, or to secure, transfer, or extend a right to property.

(b) Under this chapter, a person's control over property of another person is "unauthorized" if it is exerted:

(1) Without the other person's consent;

 I.C. 35–43–4–1(a) & (b) (West 2006).

The critical element of the tort of conversion under Indiana law is the exercise of unauthorized control over the property of another: "To constitute the tort of conversion, there must be an appropriation of the property of another;" *Stevens v. Butler,* 639 N.E.2d 662, 666 (Ind.App.1994). As stated in *Indiana & Michigan Electric Company v. Terre Haute Industries, Inc.,* 507 N.E.2d 588, 610 (Ind.App.1987):

Conversion is a tort involving the appropriation of personal property of another to the tortfeasor's own use and benefit, to the exclusion of and in defiance of the owner's rights, under an inconsistent claim of title; mens rea is not an essential element. 6 I.L.E. *Conversion* sec. 11 (1958). Thus, the mere existence of the tort does not necessarily carry with

it the imputations of malice, so even if the tortfeasor acted in good faith in assuming dominion over the property, such is no defense. *Howard Dodge & Sons, Inc. v. Finn* (1979), 181 Ind.App. 209, 391 N.E.2d 638. Lack of consent by the owner is an element. 6 I.L.E. *Conversion* sec. 13 (1958).

The state court judgment granted to Davis has no finding of anything remotely approaching a determination of fraudulent intent on the part of Karner. The record on which the judgment was based has no fact which implicates fraud—the record establishes only the facts necessary to provide the elements of conversion under Indiana law, i.e., the exercise of unauthorized control over property of another. Establishment of the federal action for an exception to discharge for "embezzlement" or for "larceny" requires establishing not only *that* property was misappropriated, but also establishing fraudulent intent, which entails the use to which the misappropriated property was placed and the intent of the misappropriator in doing the act of misappropriation. Based upon the record in the Lake Superior Court, the judgment granted to Davis fails to establish the critical federal element of Karner's fraudulent intent, and that judgment has no collateral estoppel effect in this adversary proceeding with respect to actions for "embezzlement" or for "larceny" under 11 U.S.C. § 523(a)(4) because the issue of fraudulent intent was never litigated in the state court proceeding.

In other words, the state court record in *Karner* was devoid of any circumstances which indicated fraud. Likewise, in the case before the court, the state court judgment against Luedtke does not establish that he obtained property or money of Falk *by means of fraud which he perpetrated against Falk as part of the act of obtaining property from Falk.* Rather, the state judgment establishes the elements necessary to support a finding that Luedtke either knowingly or intentionally *received* stolen property. This court will not hold that this determination *ipso facto* establishes fraudulent intent under 11 U.S.C. § 523(a)(4), especially given the fact that the state court was quite explicit in stating in its final order that James Luedtke "did not cause the loss to the Plaintiff, Theresa M. Luedtke caused that loss. He did, however, receive a financial benefit as a result of Theresa M. Luedtke's theft." The issue of Luedtke's intentional involvement in his wife's theft, aside from his either knowingly or intentionally receiving the proceeds of that theft, was not an issue that was litigated in the state court.[30] Therefore, for all the foregoing reasons there is no collateral estoppel effect in this adversary proceeding arising from the judgment of the Porter County Superior Court as to Falk's claim of dischargeability against Luedtke pursuant to 11 U.S.C. § 523(a)(4).

■ Falk also argues that because the elements of Luedtke's liability as established by the state court satisfy the "actual fraud" elements of § 523(a)(2)(A), collateral estoppel applies. This court, in the case of *In re Hostetter*, 320 B.R. 674 (Bkrtcy. N.D.Ind.2005), conducted an extensive analysis of this provision in the context of the standards used to determine whether certain pre-petition charges and cash advances a debtor made to a credit card were

---

**30.** The issue of fraudulent intent in the context of "actual fraud" under § 523(a)(2)(A) will be explored further *infra*. As will be seen, "fraud" is a much more all encompassing concept under § 523(a)(2)(A), in contrast under § 523(a)(4), fraud is one of several elements in a larcenous act.

nondischargeable. In doing so, the court examined the standard for actual fraud as established by the Seventh Circuit:

As explained by the Seventh Circuit Court of Appeals in *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir.2000), § 523(a)(2)(A) has three *distinct* forms of conduct which can lead to nondischargeability: false pretenses, false representation, or actual fraud. A representation is not necessary if actual fraud can be established; because actual fraud is broader than misrepresentation, it can be defined as "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *McClellan*, 217 F.3d at 893 citing 4 *Collier on Bankruptcy* P 523.08[1][e], o. 523–45 (15th ed., Lawrence P. King Ed., 2000). As this Court construes § 523(a)(2)(A), most garden variety credit card and bad check cases will rise or fall under the "false representation" portion of the statute. There may be cases, however, in which a plaintiff with this type of case may not be able to establish a false representation but can still establish actual fraud: the deviations of the human mind are myriad and clever, and the circumstances of each case can only be judged against the applicable legal standards.

*In re Hostetter*, 320 B.R. at 680.

Falk argues that the act of receiving stolen property satisfies this standard, and in support cites the case of *In re Holt*, 24 B.R. 215 (Bkrtcy.E.D.Tenn.1981). In that case, the debtor's debt to a utility company was deemed not dischargeable for the period of time between when her husband, who did the actual theft, passed away, and when it was discovered by the creditor. The decision, being only one page long, does not provide any analysis for its conclusion, and as solely conclusory it has no precedential value. The elements necessary to make a successful showing of actual fraud under § 523(a)(2)(A) were established by the Seventh Circuit Court of appeals in the case of *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir.2000). In *McClellan*, the creditor sold ice-making machinery to the debtor's brother for $200,000. The brother defaulted, owing more than $100,000. When the creditor sued in state court, the brother sold the machinery to his sister, the debtor, for $10. She sold it to a third party for $160,000 and then filed bankruptcy. The creditor seller filed an adversary proceeding seeking to recover the debt that he alleged the debtor owed him as the recipient of a fraudulent transfer. The bankruptcy court dismissed his complaint on the ground that the debt was dischargeable, and the district court affirmed. The Seventh Circuit Court of Appeals held that while there may not have been a misrepresentation, the "actual fraud" described in 11 U.S.C. § 523(a)(2)(A) was broad enough to encompass those situations in which a debt was incurred to a creditor by committing a fraud against him, even though it might have been a step removed from involvement with the creditor. The Seventh Circuit held that the creditor's complaint stated a claim, entitling the plaintiff creditor to attempt to prove that his allegations were true. In its opinion, the court extensively discussed the meaning of "actual fraud" in the context of § 523(a)(2)(A):

Plenty of cases, it is true, assume that fraud equals misrepresentation, but like *Field* they are cases in which the only fraud charged *was* misrepresentation. *In re Maurice*, 21 F.3d 767, 773–74 (7th Cir.1994); *In re Ettell*, 188 F.3d 1141, 1144 (9th Cir.1999); *In re Biondo*, 180 F.3d 126, 133–34 [*893] (4th Cir.1999); *Sanford Institution for Savings v. Gallo*, 156 F.3d 71, 74–76 (1st Cir.1998);

*Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir.1997); *In re Hashemi*, 104 F.3d 1122 (9th Cir.1996); *In re Apte*, 96 F.3d 1319, 1322 (9th Cir.1996); *In re Young*, 91 F.3d 1367, 1373 (10th Cir. 1996); *In re Eashai*, 87 F.3d 1082, 1086–89 (9th Cir.1996); *In re Arm*, 87 F.3d 1046 (9th Cir.1996); *In re Johannessen*, 76 F.3d 347, 350 (11th Cir.1996); *In re Vann*, 67 F.3d 277, 280 (11th Cir.1995). Most frauds do involve misrepresentation and so *In re Biondo*, for example, describes the fraud involved there as "the tort of fraudulent misrepresentation." 180 F.3d at 134; see also *Field v. Mans, supra*, 516 U.S. at 70, 116 S.Ct. 437; *In re Maurice, supra*, 21 F.3d at 773–74. But section 523(a)(2)(A) is not limited to "fraudulent misrepresentation." Although *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 472–74, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), held that the concept of fraud in the SEC's Rule 10b–5 is limited to misrepresentation and therefore did not reach the nonrepresentational breach of fiduciary duty—a squeeze out of minority shareholders—charged in that case, there are no such holdings with regard to the concept of "actual fraud" in 11 U.S.C. § 523(a)(2)(A). There could not be; for by distinguishing between "a false representation" and "actual fraud," the statute makes clear that actual fraud is broader than misrepresentation. Collier's treatise, while assuming along with the cases that we have cited that "actual fraud" involves a misrepresentation, defines the term much more broadly—as "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another," 4 *Collier on Bankruptcy* para. 523.08[1][e], p. 523–45 (15th ed., Lawrence P. King ed., 2000)—which is a good description of what the debtor is alleged to have done here.

Pressed at argument, her lawyer was unable to suggest any reason why the type of fraud presented by the allegations of McClellan's complaint should be treated differently from other types of fraud. The two-step routine that McClellan alleges and that we must take as true—in which Debtor A transfers valuable property to B for nothing in order to keep it out of the hands of A's creditor and B then sells the property and declares bankruptcy in an effort to shield herself from liability for *having colluded* with A to defeat the rights of A's creditor—is as blatant an abuse of the Bankruptcy Code as we can imagine. It turns bankruptcy into an engine for fraud. Though cases often say that exclusions from dischargeability should be narrowly construed, *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 59 L.Ed. 717 (1915); *Palmacci v. Umpierrez, supra*, 121 F.3d at 786, we have emphasized that they "serve vital functions." *In re Mayer*, 51 F.3d 670, 674 (7th Cir. 1995). "Congress concluded that preventing fraud is more important than letting defrauders start over with a clean slate, and we must respect that judgment." *Id.*

No learned inquiry into the history of fraud is necessary to establish that it is not limited to misrepresentations and misleading omissions. Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all "surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *Stapleton v. Holt*, 207 Okla. 443, 250 P.2d 451, 453–54

(Okla.1952). Breaches of fiduciary obligation are commonly punished as frauds even when there is no misrepresentation or misleading omission. E.g., *Doner v. Phoenix Joint Stock Land Bank,* 381 Ill. 106, 45 N.E.2d 20, 24 (Ill.1942); *Conway v. Conners,* 101 Ill.App.3d 121, 427 N.E.2d 1015, 1020, 56 Ill.Dec. 610 (Ill. App.1981). A separate provision in section 523 excludes from discharge debts arising from fraud "in a fiduciary capacity," 11 U.S.C. § 523(a)(4); it would be shocking if that exclusion were limited to *misrepresentations* by fiduciaries. And, coming to this case, when a debtor transfers property to a third party without adequate consideration, the transfer is deemed a fraud on the debtor's creditors. 740 ILCS 160/5–6; *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir.1995). The fraud may be either constructive or actual. (Sometimes the terms "fraud in law" and "fraud in fact" are used.). It is constructive if the only evidence of it is the inadequacy of the consideration; it is actual if the debtor intended by the transfer to hinder his creditors. See, e.g., *id.* at 757; *In re Liquidation of MedCare HMO, Inc.,* 294 Ill.App.3d 42, 689 N.E.2d 374, 380–81, 228 Ill.Dec. 502 (Ill.App.1997); *Regan v. Ivanelli,* 246 Ill.App.3d 798, 617 N.E.2d 808, 814, 187 Ill.Dec. 351 (Ill.App.1993). The fraud exception to the dischargeability of debts in bankruptcy does not reach constructive frauds, only actual ones, but the allegation here is that the transfer involved an *actual* fraud; the debtor's brother was *deliberately* attempting to thwart McClellan's effort to collect the debt due him. And while it is true that McClellan did not rely on the brother's retaining the security for the loan, reliance is relevant only when a fraud takes the form of a misrepresentation. And that, as we have emphasized, is not the only form that fraud can take or the only form that makes a debt nondischargeable, given that debts created by misrepresentations constitute a separate category of nondischargeable debts.

The distinction between actual and constructive fraud is the key to this case in two distinct senses. *First.* To transfer property for less than adequate consideration may be desperate, foolish, or imprudent, and the receipt of such a transfer a pure windfall, but neither the transfer nor the receipt is in and of itself dishonest, and so neither is an appropriate ground for refusing to allow the debtor to discharge the debt arising from the transfer and thus to get on with his life without the debt hanging over his head. The situation is entirely different, and the debtor's equities and argument for discharge much weaker, when the debtor is guilty of intent to defraud. The purpose of section 523(a)(2)(A) in confining nondischargeability to actual fraud is merely to recognize this difference and thus to exclude constructive fraud. See *Neal v. Clark,* 95 U.S. 704, 709, 24 L.Ed. 586 (1877); *In re Anastas,* 94 F.3d 1280, 1286 (9th Cir. 1996); 4 *Collier on Bankruptcy, supra,* para. 523.08[1][e], p. 523–45. This purpose is unrelated to whether the intent to defraud was implemented by a misrepresentation or by some other improper means.

*Second.* The distinction between actual and constructive fraud answers the objection that section 523(a)(2)(A) is intended to reach fraud in the inception of a debt—fraud that created the debt—whereas the law of fraudulent conveyance is merely a method of facilitating the collection of a previous debt that need not itself have been created by a fraud. The first point is correct; the second point is correct in a case of a *constructively* fraudulent conveyance;

but when actual fraud is involved, the first point is satisfied. To explain: when a conveyance is merely constructively fraudulent, in the sense that having transferred the property that secured the debt without obtaining adequate consideration the debtor is now unable to pay his creditor, the transferee is not guilty of an actual fraud against the creditor and so the creditor cannot use section 523(a)(2)(A) to prevent the transferee from discharging the debt in bankruptcy. And so in this case, if though the debtor's brother intended to thwart McClellan and was thus committing actual fraud, his sister was innocent—if she had no intention of hindering any creditor—the debt that McClellan is seeking to collect from her would not have been obtained *by her* by actual fraud. But she is alleged to have been a full and equal participant in her brother's fraud, to have been in effect his accomplice, as in *Cenco v. Seidman & Seidman*, 686 F.2d 449, 452–453 (7th Cir.1982). The debt that McClellan is seeking to collect from her (and prevent her from discharging) arises by operation of law *from her fraud*. That debt arose not when her brother borrowed money from McClellan but when she prevented McClellan from collecting from the brother the money the brother owed him.

*McClellan at* 217 F.3d at 892–95 [emphasis supplied].

 Under *McClellan*, bankruptcy courts have held that in order to prove a claim based on actual fraud a creditor must prove that: (1) a fraud occurred; (2) the debtor was guilty of intent to defraud, and (3) *the fraud created the debt that is the subject of the discharge dispute. In re*

*Jairath,* 259 B.R. 308, 314 (Bankr.N.D.Ill. 2001); *In re Kucera,* 373 B.R. 878, 883 (Bankr.C.D.Ill.2007). In *McClellan* it was obvious that there was an intent on the part of the debtor to defraud the creditor by actively participating in her brother's scheme. In other words, there was an active scheme between the brother and sister that resulted in the creditor's loss. To paraphrase 11 U.S.C. § 523(2)(A), the debtor sister's "debt"[31] was for her obtaining property of the creditor (the ice machine) by actually fraudulently conspiring with her brother to deprive the creditor of the machine. In the case currently before the court, the conclusion that the state court determination found that there was a scheme between James Luedtke and Theresa Luedtke to deprive Falk of funds embezzled by Theresa cannot be drawn.

 All that is known from the record in the state court is that James Luedtke either knowingly or intentionally received the stolen property of Falk. According to the Porter County Superior Court's judgment, he was not the one who caused Falk's loss, but rather he only benefitted from it. To sustain a § 523(a)(2)(A) action for actual fraud, there must be a "deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another". The record before the court is devoid of any facts which indicate that James Luedtke and Theresa Luedtke were working in concert to defraud Falk through Theresa's embezzlement, or that James Luedtke—knowingly benefitting somehow from Theresa's illegal conduct—acted fraudulently to thwart Falk's recovery of its property. The Indiana statute under which Luedtke was held liable does no more than impose the

---

**31.** "Debt" is defined in 11 U.S.C. § 101(12) to be "liability on a claim"; "Claim" is defined in 11 U.S.C. § 101(5)(A) to be a "right to payment".

determination of the Indiana legislature (and Indiana courts construing a legislative enactment) that one who receives another's property, knowing that the received property was stolen, is liable to the owner of the property for the value of the benefit received from the stolen property. In a sense, the conduct in part punished by the Indiana formulation is not ratting out the thief, a crime of nondisclosure of known facts, as contrasted to active participation in a scheme to hide known facts; or, just not saying "No!" to the benefit conferred by the stolen property, a crime of passive acquiescence rather than affirmative collaboration. 11 U.S.C. § 523(a)(2)(A)'s elements require more than passive knowledge and nondisclosure, or passive acquiescence. The court cannot sustain the proposition that the doctrine of collateral estoppel, arising from the record that Luedtke was found by a jury in a state court to have, "knowingly or intentionally received, retained, or disposed of money which was the subject of theft in the amount of $368,081.00", results in the determination that his debt to Falk is therefore nondischargeable under the actual fraud prong of § 523(a)(2)(A). To the contrary of Falk's proposition, there is a specific statement by the state court that Luedtke did not cause Falk's loss. Also, although not necessarily dispositive in these proceedings, the fact that Falk dismissed the count for actual fraud against Theresa Luedtke and James Luedtke does not bolster Falk's contention that an issue of fraud was litigated in the state court. Based upon the stipulated record, the state court determination against James Luedtke did not establish the "actual fraud" required by 11 U.S.C § 523(a)(2)(A).[32]

IT IS ORDERED that there is no collateral estoppel effect in this adversary proceeding arising from the judgment of the Porter County Superior Court entered on May 2, 2007, in the case of *Falk Surveying & Engineering, Inc v. Theresa Luedtke, et al.*, cause no. 64D02–0306–CT–4819 which establish the elements of either 11 U.S.C. § 523(a)(4) or 11 U.S.C. § 523(a)(2)(A).[33]

IT IS FURTHER ORDERED that a telephonic preliminary pretrial conference will be held on **April 28, 2010, at 10:00 A.M.** to determine the course of further proceedings in this adversary proceeding.

---

32. There are many unanswered factual questions at this point which may support a finding of actual fraud under § 523(a)(2)(A). Leudtke benefitted from the theft, but how did he benefit? Did he take any acts in furtherance of the theft? Was the theft from Falk his idea, or did he encourage and support the actions of Theresa Leudtke? Did he take any affirmative actions to dispose of, hide or transfer Falk's property so as to keep it out of Falk's hands? In sum, there are no facts or issues which were litigated and ultimately decided which would now support a finding of actual fraud under 11 U.S.C. § 523(a)(2)(A). This is not to say that this could not be established at a later time in these proceedings.

33. Because this decision does not finally determine the complaint's ultimate prayer for relief—but rather only negates recovery as a matter of law based upon the collateral estoppel effect of the state court judgment—the determination made herein is not a final judgment under Fed.R.Bankr.P. 7054(a)/ Fed.R.Civ.P 54(b).